26,427-04

CAUSE NO._____

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

| | | |
|---|---|---|
| ARMANDO SIMON, | § | WRIT OF HABEAS CORPUS |
| Petitioner, *pro se, in forma pauperis* | § | FROM THE 290th DISTRICT |
| | § | BEXAR COUNTY, TEXAS |
| STATE OF TEXAS, | § | TRIAL COURT CAUSE # |
| Respondent | § | 2010-CR-2132 |

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 27 2015 tocs

Abel Acosta, Clerk

BRIEF FOR PETITIONER

ORAL ARGUMENT REQUESTED

RECEIVED IN
COURT OF CRIMINAL APPEALS

APR 0 9 2015 CW

Abel Acosta, Clerk

1

# TABLE OF CONTENTS

Cases and documents cited                                              3

Brief facts of the case up to and including the trial                  6

Brief facts of the case subsequent to trial                           7

Issues presented in this writ of habeas corpus                        11

Arguments                                                             12

    1) Wrong case was prosecuted                  12

    2) Voi Dire                                   13

    3) Grand Jury                                 13

    4) Mistrial                                   14

    5) Questionnaire                              15

    6) Perjured testimony by Tina Hernandez       16

    7) Destruction of exculpatory evidence & perjury by Curtis

       Hermosillo                   16

    8) Overbreadth doctrine                       18

    9) The law is un-Constitutional                21

    10) Insufficiency of evidence                 22

    11) Bill of attainder                         26

    12) Conditions of probation & parole are un-Constitutional   28

    13) Cruel and unusual punishment              34

Conclusion                                                           37

Appendix                                                             41

# CASES & DOCUMENTS CITED

Barnett, Randy. "The Ninth Amendment: It Means What It Says," *Texas Law Review, 85,* 2006.

*Brady v. Maryland,* 373 U. S. 83, 83 S. Ct. 1194.

*Carr v. U.S.* 560 U.S. 438, 130 S. Ct. 2229

*Carson v. Gomez,* 14 SW 3d 778, rehearing overruled, review denied, certiorari denied 121 S. Ct. 807, 531 U.S. 1088, 148 Le D 2d 693.

*Coleman v. Thompson,* 501 U. S. 722, 111 s. Ct. 2546.

*Doctor v. Walters,* C.A. (Pa) 1996, F.3d 675.

*Doe v. Menefee,* 391 F. 3d 147.

*Fleming v. Nestor,* 363 U.S. 603, 80 S. Ct. 1367.

*Green v. State,* 350 S.W.3d 617 (Tex.Crim.App—Houst. [14th Dist], 2011, pet refd.

*Greene v. Massey,* 437 U. S. 19, 98 S .Ct. 2151.

Hamilton, Alexander, *The Federalist Papers* #84, Mentor Books, 1961.

*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 Le D. 2d 560.

*Johnson v. State,* 672 SW 2d 621

Levenson, Jill & Cotter, Leo. (2005) The impact of sex offender residence restrictions: 1,000 feet from danger or one step from absurd? *International Journal of Offender Therapy and Comparative Criminology, 49,* 168-178.

Levenson, Jill & Hern, Andrea. (2007) Sex offender restrictions: unintended consequences and community reentry. *Justice Research and Policy, 9,* 59-73.

Levenson, Jill & Tewksbury, Richard. (2007) Collateral damage: family members of

registered sex offenders. *American Journal of Criminal Justice, 34,* 54-68.

*Leonard v. State,* 385 SW 3d 570

*Marcum v. State, 983 SW 2d 762*

*Murray v. Carrie,r* 477 U.S. 478, 496, 106 S. Ct. 2649

Plutarch, *Lives*

Pride, Mary. *The Child Abuse Industry,* Crossway Books, 1986

*Reynolds v. U.S.* 132 S. Ct. 975

*Saldano v. State,* 70 SW3d 873

*Simpson v. State,* 772 SW 2d 276

*Simon v. State,* 2014 WL 129635

*Simon v. State,* WL 2012, 4900916

*Smith v. Doe,* 538 U.S. 84, 123 S. Ct. 1140

*Tamez v. State,* 534 SW 2d 686

Tex. Code Crim. Pro. 62.055

*U.S. v. Comstock,* 560 U.S. 126,130 S. Ct. 1949

*U.S. v. Kebodeaux,* 133 S. Ct. 2496.

*U. S. v. Mills,* 959 F. 2d 516

# WRIT OF HABEAS CORPUS

NOW COMES ARMANDO SIMON, acting *pro se*, was convicted in 2011 for Failure to Register a Change of Address, after a jury trial, and would show that the verdict, sentencing, and conditions of his probation are unconstitutional, and, consequently, prays for relief from the Courts and asks for an Evidentiary Hearing. In it, he hopes to be able to prove that one of the key witnesses committed perjury.

This court has jurisdiction to entertain this Writ under Article 11.072 of the Texas Code of Criminal Procedure. According to the Code of Criminal Procedure 11.14 (1), Petitioner has his liberty restrained, and in 11.21 is the subject of coercive measures, and 11.22 is under control and restraint. This is true even if he is not on probation, parole, and/or discharges his sentence. Additionally, retaining this conviction would categorize him as a habitual criminal and would furthermore subject him to the rule of "3 strikes, you're out."

## BRIEF FACTS OF THE CASE UP TO AND INCLUDING THE TRIAL

Petitioner was renting a house from Tina Hernandez, who was living in Amarillo. In November 2009, Petitioner and wife separate due to the stress of being harassed by neighbors and unable to find steady employment both because of his status as a registered sex offender. In the same month, Hernandez orders the Petitioner to leave by the end of the month because she is moving back in. Petitioner finds no place that will admit him because of his labeled status as a "sex offender" (which is a misnomer because it implies

that the Petitioner in presently acting out as such). After she moves into the house in late November with Simón living now in one of the rooms, the hostility becomes so intolerant because of money owed her that Petitioner either sleeps in his car in the driveway in order to comply with the law **4RR47, 50**, since there is no requirement that a person must sleep in a particular area of the property **3RR60**, or sleeps in a nearby business parking lot as he tries to find a residence. On December 3, he contacts Officer Allen that he is going to move **3RR65-66**, but has not yet found a place to do so. Tina Hernandez, on her own initiative, contacts Mr. Allen claiming that Simón moved away weeks before.

Petitioner at the time is separated from his wife [see item #1]; she asks him to babysit the children for a couple of days while she is away on work [see item #2] for a three days **4RR9-12**. He does so. On the first morning, on his way to dropping off his children at school, he is stopped on a routine traffic stop and extensively and belligerently interrogated by the officer who is convinced, upon running a background check, that he is in the process of kidnapping children; the children are scared by his demeanor and when they finally calm down to verify their identity, he is free to go; Simón is arrested that night, at the children's home. **4RR68-69**

In 1985, Armando Simón was convicted of Sexual Assault; this was his only felony conviction until the present case. Petitioner was indicted on February 25, 2010 with failure to Register a Change of Address in cause number 2010-CR-2132. Petitioner rejected nearly a dozen offers of probation from the prosecution in exchange for a guilty plea and instead elected to represent himself at his trial. Although the case was tried in the 290th District Court, Judge Melisa Skinner's Court, the case was presided over by visiting Judge Pat Priest. On October 19, 2011 the jury convicted Petitioner. On the same

day, Judge Priest assessed punishment at 2 years in the Texas Department of Criminal Justice, but the sentence was probated for a period of 10 years. **4RR96-97.**

**BRIEF FACTS OF THE CASE SUBSEQUENT TO TRIAL**

An appeal was prepared and submitted on April 3, 2012, by a Court appointed attorney; it is important to note that said attorney refused to include various issues that Petitioner strongly felt were crucial to the case and which are included herein, concentrating instead on the insufficiency of evidence, because she claimed the Court would not be able to concentrate on too many grounds, or, because they were inapplicable for an appeal; nonetheless, they could have been, and are, of relevance in a writ of habeas corpus. No. 04-11-00783-CR [see Secondary Appendix]

The 4th court of Appeals denied the appeal, *Simon v. State* WL 2012, 4900916. During the appeal process, Defendant did not report to the probation bureaucracy. Upon receiving notice that the 4th Court had denied the appeal, Defendant decided to continue to the next step with a Petition for discretionary Review (PDR), carried out *pro se,* filed on November 6, 2012 with the Court of Criminal Appeals. On February 12, 2013, the PDR was denied in cause 1599-12, notification arriving in a white card. Upon receiving the said white card, Petitioner immediately reported to the probation bureaucracy, which typically had no record of the matter but which put him right away in probation status, with minor restrictions.

On, or about March 1, 2013 Petitioner received a visit from his probation officer and disagreements ensued, which resulted in having additional, harsh, conditions added

7

on by the Court after a report was filed, said report Petitioner was not privy to. One of them was to attend sex offender counseling sessions conducted by a policeman. Petitioner did not do so, was arrested on or about April 4 and his probation revoked on or about the 24th of April.

Meantime, Petitioner had filed an Article 11.072 Writ of Habeas Corpus with the trial court on March 12, 2013, citing the conditions of community supervision as well as errors in the trial itself. On May 31, 2013 the Court denied the writ on the basis that Petitioner had filed it prior to the mandate (04-11-00783-CR) from the Court of Appeals issuing its mandate on March 19, which the Court itself admitted was a legal technicality.

Thereupon, Petitioner filed a 2254 Writ of Habeas Corpus with the U.S. District Court on June 28, 2013. A year later, the Court denied the writ, agreeing with the State counsel that exhaustion of State remedies had not occurred; in doing so, the Court ignored Petitioner's rejoinder that doing so would have been a fruitless endeavor since the higher State Courts would have agreed that the writ had been filed a few days too early, prior to the mandate (04-11-00783-CR) being issued, and time was ticking. The Court also ignored Petitioner's pointing out that, comity notwithstanding, according to *Doctor v. Walters* C.A. (Pa) 1996, F.3d 675 and *Murray v. Carrier* 477 U.S. 478, 496, 106 S. Ct. 2649, an exception can be made in order to avoid a miscarriage of justice, or, when going back to the State level would be fruitless, thereby avoiding a bureaucratic mentality. Petitioner had also pointed out that going back to square one would be tantamount to putting him in the role of Sisyphus. Nonetheless, the Court denied the writ and, in disgust, Petitioner allowed the deadline to elapse before appealing to the U.S. 5th Circuit Court.

However, to make this case even more convoluted, on January 28, 2014, Petitioner, who was in county jail at the time, was placed on parole even though his appeal on the revocation of his probation was still pending *Simon v. State,* 2014 WL 129635; this parole status ceased in May while Petitioner awaited the 4th Court of Appeals decision on the revocation. On July 30, 2014 the Court of Appeals vacated the revocation of probation on the basis that the judge had abused its discretion. Petitioner had filed a writ of habeas corpus on September 24, 2014. The next day, Petitioner was placed on community supervision with restrictions against his religion being placed [item # 16]. The writ was denied on October 9 because it was filed prior to the mandate being issued and received by the Court. Petitioner once more filed the writ of habeas corpus on December 4, 2014 to begin the process all over again. On March 4, 2015, to absolutely no one's surprise the writ was denied.

Whereupon Petitioner files this writ of habeas corpus with the 4th Court of Appeals to begin the process. All over again. All evidence cited in the present writ is on record with the trial court in the previous writ. Petitioner cannot produce copies of the evidence, and, of multiple copies of this writ due to dire financial reasons. Additionally, two items have recently come into his possession (after being lost) which will be relevant to this matter and are appended in Secondary Appendix, attached herein.

# ISSUES PRESENTED IN THIS WRIT OF HABEAS CORPUS

#1 The Wrong Case was Prosecuted

#2 *Voi Dire*

#3 Grand Jury

#4 Mistrial

#5 Questionnaire

#6 Perjured testimony by Tina Hernandez

#7 Destruction of exculpatory evidence & perjury by Curtis Hermosillo

#8 Overbreadth

#9 The law is un-Constitutional

#10 Sufficiency of Evidence

#11 Bill of Attainder

#12 Conditions of probation & parole are unconstitutional

#13 Cruel and unusual punishment

# ARGUMENTS

## #1 WRONG CASE WAS PROSECUTED

The trial took place for case 2009-CR-7309. **2RR4** This case is case 2010-CR-2132. As bizarre as it may seem, Petitioner was incarcerated for a crime that he did not commit, and has served time for a trial that never took place.

The scheduled trial was for case 2009-CR-7309. However, the witnesses, evidence, circumstances, and testimony were all irrelevant to that case, but, they were relevant to case 2010-CR-2132. Then, about two days after the end of the trial the State compounded its blunder by dropping case 2009-CR-7309 for lack of evidence [see item #3]. To cap it all off, all further legal proceedings have taken place for case #20110-CR-2132 (including this writ) as if it had originally gone to trial. The **14th Amendment** to the United States Constitution states, in part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law." As well as the **5th Amendment**: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law."

Is this a legal technicality? Of course it is. But so was ruling against Petitioner's original writ of habeas corpus by the trial Court, and the Federal District Court, legal technicalities. For that matter---assuming for the sake of argument---that Petitioner did

11

indeed move and not report a change of address for a couple of weeks, that too would have been a legal technicality. So this is not a matter *of De minimis non curat lex* (the law does not concern itself with trifles).

#2 *VOI DIRE*

Granted that both sides in a trial have peremptory challenges to picking jurors. However, if one goes along with the basic premise that a defendant is innocent until proven guilty, a concept which is endemic in every international legal edifice, then the prosecutor should not have the power to strike out potential jurors simply because that juror is well educated, or has voiced that he/she thinks the Defendant is innocent, etc. A prosecutor should be severely restricted as to the reasons for striking a juror (such as any relationship to the Defendant), and, should be forbidden from asking questions which are of a "fishing expedition" in nature in order to ascertain a juror's state of mind. This violates due process. Examples of this can be found in the present case. **2RR22-81**

The jurors which demonstrated a consideration that the Defendant was innocent, or, any kind of education above high school, or for that matter, any degree of rationality, were struck off by the prosecutor.

#3 GRAND JURY

The Founding Fathers realized that being accused of a crime and having to go through a trial was a traumatic event. Hence, they came up with the concept of the Grand Jury in order to determine first if the evidence warranted a trial. This is not just some

12

armchair speculation. Individuals have committed suicide when formally accused of a crime even though they were innocent.

It is also a fact that individuals have been held in custody for over a year, pending trial, whereupon they are finally released---after losing their jobs and/or families---for lack of evidence. In these instances, the prosecutor was playing a game of "chicken," hoping that the innocent person would plead to a minor sentence, such as probation even though there was no evidence against that defendant, i.e., he was innocent. Petitioner met several while incarcerated who were in jail for nearly a year but since they would not "crack," and there was no evidence against them, they were finally released.

The concept of the Grand Jury has been perverted by prosecutors. Almost always, it has been relegated to being a rubber stamp. In the rare instances wherein a Grand Jury has gone against the wishes of the prosecutor, the latter has simply convened another Grand Jury which would give a true bill.

The Grand Jury that oversaw the presentation of the evidence against the Defendant should have had an independent advocate to argue, if ever so briefly, why a trial should not take place.

The above problem with Grand Juries violates the **5th Amendment** to the United States Constitution.

## #4 MISTRIAL

A motion for a mistrial was denied by the Court when the Defendant objected to both the Prosecutor and Hermosillo mentioning details of the original offence that had occurred 27 years prior, contrary to the Court's order on August 12, 2011. This order was

13

a result of a Motion for *Limine* asking the Court to eliminate all mention of that offense by either the Prosecutor or any of his witnesses. The motion was denied, the Court remarking that to do so, the law would be effectively nullified; the Court did order to restrict the Prosecution from mentioning details, such as the age of the complainant (16 y/o) in order to ensure a fair trial. The Court denied the Motion for Mistrial on the grounds that the same information was deliberately introduced by stealth by the prosecutor earlier in a document, and the Defense had not objected then, since the age had not been voiced. **3RR79-80** However, said record was never viewed by the jury.

## #5 QUESTIONNAIRE

A motion introduced to the Court by the Defendant, prior to the trial beginning, to administer a questionnaire to the *voi dire* candidates was denied. The Court stated that a questionnaire was appropriate only for capital cases, and, that some of the questions' answers were readily available from the card that the *voi dire* candidates were to fill out. **2RR11-12**

However, what the Court failed to appreciate is that verbally answering some of the questions would evoke a negative emotional reaction, since this trial indirectly involved a sexual offence. Sex offences are universally acknowledged to evoke a negative, visceral response. This negative emotion would then become emotional contagion and would contaminate the jury pool prior to the trial even starting. This could be, and was, exploited by the prosecution for prosecuting the case from the very

14

beginning, which is what happened. **2RR22-81** In one such instance, a female juror who had herself been the victim of sexual assault began to cry loudly. **2RR95**

In addition, experimental evidence exists that actual viewpoints may be admitted in the privacy of a paper and pencil questionnaire what would not be voiced in public.

## #6 PERJURED TESTIMONY BY TINA HERNANDEZ

The Defendant's star witness was a sociopath named Tina Miranda, aka Tina Hernandez, aka Tyna Holmes, aka Tina Ornelas, Tina Wilkins. A habitual, incorrigible criminal, she has had convictions for shoplifting, theft of state property, bounced checks **4RR36** and murder **3RR120-123**. She described the butchering of her husband as simply "domestic violence." At the time of her testimony, she had been charged with theft of elderly ($120,000), for which she subsequently pled guilty and received probation by Judge Angus (who is presently under investigation for taking bribes). During her cross-examination, she denied having shoplifted, in spite of her *official* criminal record, thereby committing perjury. **3RR121-122** She denied being vindictive towards the Defendant, yet simultaneously admitted that the Defendant owed her money and had greatly inconvenienced her. **3RR125-126**

## #7 DESTRUCTION OF EXCULPATORY EVIDENCE & PERJURY BY CURTIS HERMOSILLO

During Defendant's opening statement, Defendant pointed out that officer Curtis Hermosillo, the patrol officer who stopped the Defendant when he was taking his

children to their school, was scheduled to testify and that Defendant was eagerly awaiting the opportunity because days after bonding out he had contacted the chief of the Live Oak Police Department **15RR16-17**. In that letter, Defendant asked the chief to preserve the tape of the incident with Hermosillo for the future trial, since it clearly showed that the officer's subsequent report of Defendant admitting to living in Live Oak was a lie, in so far as it has Defendant repeatedly informed the officer that he was homeless **6RR66**. It also showed the officer to have been extremely belligerent and obsessed with the idea that the children that he was taking to school (his biological children) were actually abductees who did not know him.

Hermosillo was called to the witness stand by the Prosecution. To the Defendant's astonishment, it was the Prosecution who first raised the issue of the tape. Hermosillo said that the tape had mysteriously malfunctioned, and had malfunctioned in only that period of time involving the incident, not before, not after. **3RR76-77** Throughout, the witness' body language was unusual during testimony, sporting a Cheshire-cat grin from ear to ear that never left his face. **4RR67-68**

Defendant subsequently called to the stand the abovementioned police chief, who confirmed having received the letter [see item # 4] requesting the preservation of the tape.**3RR165-170** Obviously, the Defendant would not have made this request if the tape corroborated Hermosillo's testimony; it would have been damning. Additionally, a letter of complaint sent to the Live Oak Police Department by the complainant was responded to, wherein Lt. Malone cites the precise time (in seconds) that the incident took place, which would strongly indicate that he was timing the video for that much accuracy [see Second Appendix].

16

The destruction of exculpatory evidence is a long-standing, cherished, tradition among both prosecutors and law enforcement personnel and we have in this case a prime example. It is a patently obvious conclusion that the tape was erased in order to achieve a conviction of the Defendant. Only someone who is determined to confirm the Defendant's conviction could possibly conclude otherwise, and, it speaks volumes of how contaminated had the jury's mind become that something so obvious was ignored.

## #8 THE OVERBREADTH DOCTRINE

The law, as it now stands, is one size fits all. "Sex offender" is not only a misnomer in that it implies that the recipient of this label is actively engaging in sexual perversions, but it is an absurd catchall term. No practical differentiations are made for the different types of behaviors that fall under this catchall category, although both common sense, and professional judgments, acknowledges that there is a tremendous gulf between the different categories of "sex offenders." However, the law makes no such distinction and treats a 19 y/o who has a consensual sex with his 16 y/o girlfriend (and subsequently marry) the same as a serial rapist, the same as an exhibitionist, the same as a college student who got drunk at a party and briefly grabbed a female's breast, the same as a serial pedophile, the same as someone who has had one offence in 30 years, the same as one who has had a dozen rapes in the past year the same as a child killer. They are all subjected to the same restrictions in parole and probation and in registration. Just as a person may not receive the death penalty for stealing a chocolate bar from a store as he

would if he was a serial killer, the same law should not apply to all so-called "sex offenders."

In the past decade, the United States Supreme Court has heard several cases challenging sex offender registries. *Carr v. U.S.* 560 U.S. 438, 130 S. Ct. 2229; *Reynolds v. U.S.* 132 S.Ct. 975; *Smith v. Doe* 538 U.S. 84, 123 S.Ct. 1140; *U.S. v. Kebodeaux* 133 S.Ct. 2496; *U.S. v. Comstock* 560 U.S. 126,130 S. Ct. 1949. Throughout these cases, the following terms have been used interchangeably, without distinction or even accuracy: sex offenders, sexual predators, child abusers, dangerous sex offenders, child sex offenders, child kidnappers, sexually dangerous persons, pedophiles, child molesters, violent sex offenders, sexual abusers of children, persons who, due to a mental illness are sexually dangerous. The same indiscriminate use can be found in the fifty states, both in and outside of courtrooms, whereupon Petitioner asks: is an exhibitionist really a "sexually dangerous person"? Is a teenager having consensual sex with his girlfriend while on their 8th date "a child molester"? In fact, even two persons convicted of Sexual Assault may have different offenses yet both be labeled identically as being violent: one is a brutal rapist the other having consensual sex with a sexually active teenager, yet both are seen as rapists.

To make differentiations in sex offenders and thereby assess requirements and punishments differently, can be very irritating to those persons on a fanatical vendetta, or who are prone to rigidly view things as black or white, yes-or-no categories, or who are alarmists who see sex offenders in every corner.

Pedophilia and rape are heinous crimes. No one is arguing otherwise. But, to insist that all of the above are equivalent is to have myopic vision, or to be a fanatic. In

18

fact, sometimes even legally in the original offence an important distinction is made: in certain instances, exposing oneself is a misdemeanor, not a felony, e.g., *Tristan v. State* 393 SW 3d 806; nonetheless, such offences are lumped together with serial pedophiles.

Furthermore, the restrictions imposed on "sex offenders" by the parole and probation bureaucracies, as occurred in the present instance, are unquestionably punitive. In *Carr v. U.S., Reynolds v. U.S., Smith v. Doe,* and *U.S. v. Kebodeaux v. Comstock, supra,* there are the usual threadbare platitudes that the restrictions are for the protection of the public, though it is never explained how, exactly, are they so. For example, how exactly is not being allowed to express one's religion during holidays a deterrent to crime? Petitioner does not know the answer and has never been enlightened. Additionally, in the deliberation of *Kebodeaux, supra,* it is even mentioned that the conditions of parole and probation are for the purpose of rehabilitation and that they deter crime, but how is not being able to be with one's one children a deterrent to crime, and how is having to ask permission of a parole bureaucrat in order to establish a romantic relationship rehabilitative? Not being a licensed attorney, Petitioner would love to learn.

Only someone who has not been listed in a sex offender registry could claim that there are no punitive consequences. Yet, all of the above, wide-varying "sex offenders" have to endure the same fate. In fact, the Alaskan Sex Offender Registry Act (SORA) *Smith v. Doe, supra)* includes child kidnappers as "sex offenders" even though this inclusion could apply to parents feuding over custody of their children.

Incidentally, the Athenian lawgiver, Draco, decreed that stealing a head of cabbage merited the death penalty (Plutarch, *Lives*), hence the term "draconian." His fellow Athenians objected, stating that that was the same punishment for murder. Draco,

too, had a rationale worthy of an American court of appeals: he stated that death was the appropriate punishment for stealing a head of cabbage, but unfortunately Nature had not allowed for a worse punishment for murderers. That kind of mentality, it seems, is alive and well when it comes to the present matter.

## #9 THE LAW IS UN-CONSTITUTIONAL

It is universally acknowledged that an accusation, to say nothing of a conviction, of a sexual offence is highly inflammatory, one which elicits a very strong emotional reaction. Consequently, is there anyone who is so obtuse as to believe or claim that a Defendant can obtain a fair trial when the first words that fall out of a prosecutor's mouth are, "The Defendant is a convicted sex offender"? A jury is thereby strongly prejudiced against the Defendant before the trial even starts. A fair trial is impossible and is thus a violation of a fundamental right. *Saldano v. State,* 70 SW3d 873.

The indictment was Failure to Report a Change of Address. **2RR109-110** The judge informed the potential jurors during *voi dire* that the Defendant had a prior conviction for Sexual Assault **2RR16-17**.

It is a cornerstone of the law that any previous offence should not be presented to a jury during a trial so that the jurors' evaluation of the evidence not be tainted. There must be no bias in the jury in order to have a fair trial as guaranteed under the **Sixth Amendment**---as well as the due process section of both the **Fifth and 14th Amendments**. This is particularly the case when the previous offense is one that is emotionally explosive, as in a sex case. This case conclusively proves, as possibly no

20

other case could, that the Defendant could absolutely not obtain a fair trial under this law since he was previously convicted, even though there was a complete lack of hard, objective, evidence---none, absolutely none---as to his having established another residence.

The Defendant noted in the trial that the change in attitude towards him before and after the information about the Sexual Assault charge was instantly noticeable, and hostile. This was evident in the *voi dire* phase **2RR85-86.** It was evident in the closing argument **4RR74**, when one juror, for example kept his face averted ninety degrees away while Defendant spoke. One juror who had been herself a victim of sexual assault began to cry loudly during the *voi dire* phase. **2RR95**

## #10 INSUFFICIENCY OF EVIDENCE

The evidence was insufficient to support a conviction for failing to register a change of address as required by the sex offender registration program because the State failed to prove that Appellant intended to change addresses. Green v. State, 350 S.W.3d 617 (Tex.Crim.App---Houst. [14th Dist], 2011, pet refd); Tex. Code Crim. Pro. 62.055(a). The evidence was insufficient to support a conviction for failing to register a change of address as required by the sex offender registration program because the State failed to prove that Appellant had actually changed addresses. Tex. Code Crim. Pro. 62.055(a). The evidence was insufficient to support a conviction for failing to register a change of address as required by the sex offender registration program because the

evidence actually supports that Appellant was in compliance with the registration requirements. Tex. Code Crim. Pro. 62.055(i).

It is ironic that some of *the Prosecution's own witnesses corroborated the fact that the Defendant had no residence.* The Prosecution tried through verbal legerdemain to imply that the issue was whether the Defendant was *intending* to move, but the indictment reads quite clearly that the Defendant *had* moved to a new residence and had not reported the change of address [see item # 5] and Article 62.055 of the Texas Code of Criminal Procedure is quite clear on this. To this day, Defendant would like to know where, exactly, did he move to. No objective, hard, evidence was produced to prove the State's case: there was no lease, no photographs, no DNA, no checks, no bills, no change of address forms, no landlord, no address. Nothing. The Defendant never truly violated the law, but he was convicted simply because he was labeled a "sex offender." At no point did the prosecutor provide an address where the Defendant was supposedly living in. Furthermore, a car is not a residence; electric power cannot be installed, nor a refrigerator, bed, or television, or sofa; nor can he receive mail, unless the mailman chances upon him and tries to chase him down while driving. And the address given by Mr. Hermosillo *turned out to be nonexistent*, one that was concocted by him on the spur of the moment **3RR73, 83**.

Insufficiency of evidence was used as the principal argument for appeal by the court-appointed appeal attorney, even though the Petitioner was forcefully insisting on citing the same arguments as in this writ. Not surprisingly, the 4th Court of Appeals cited---as usual---the Calvinistic *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 LeD. 2d 560 for not wanting to overturn the conviction. The *Jackson v. Virginia* case is

constantly being utilized by the various courts of appeal of various states in order to avoid their responsibility. In the denial, the 4th Court of Appeals stated that, "Under that standard, we view all of the evidence in the light most favorable to the verdict whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt."

Yes, by all means, let us review *all* of the evidence.

In the Court of first instance, the State's case rested principally on the testimony of two individuals. Curtis Hermosillo claimed that in mid-December Petitioner lived at a particular address---which turned out does not exist. Tina Ornelas---a habitual criminal guilty of everything from fraud and theft to shoplifting and murder---claimed that Petitioner had moved out in mid-November. Now, if one were to look at the prosecution's evidence, and only at the prosecution's evidence---without even so much as looking at the cross-examination---then one would, of course, agree that the weight of the evidence is on the side of the State.

But, if we also include the cross-examination, the defense witnesses and the defense's evidence, i.e., if we truly include ALL of the evidence, then it becomes a totally different matter.

In regards to Hermosillo, the facts that Petitioner asked the Live Oak police chief to preserve the tape wherein Petitioner explained to Hermosillo he was homeless, that this was confirmed by the police chief, Hermosillo's mocking demeanor in Court, that the Defendant in his opening statement stated he was looking forward to presenting the tape which was *objective proof* of his innocence, that it was the *prosecutor* who first brought up the tape, *and,* that the said tape mysteriously "malfunctioned" only for those crucial 15

23

minutes according to his testimony, then Hermosillo's testimony appears to be rotten, rotten to the core, as befits a "bad cop."

And then there is the testimony of Tina Ornelas (or Hernandez) who was, and remains, a verified sociopath, who committed perjury on the stand, and who admitted that Petitioner owed her money and had greatly inconvenienced her. Now, a convicted felon's word is always suspect in any State. *Carson v. Gomez,* 14 SW 3d 778, rehearing overruled, review denied, certiorari denied 121 S. Ct. 807, 531 U.S. 1088, 148 LeD 2d 693. However, if it helps to *convict* a Defendant, it seems then that the testimony of a felon *is* reliable. But, if it helps to *exonerate* a Defendant, then a felon's testimony is deemed worthless. Incidentally, this unfair prejudice is similar to a mother's or a wife's testimony.

Additionally, in using *Jackson v. Virginia* as a crutch, the 4th Court of Appeals arbitrarily discounted the testimony of Petitioner's ex-wife for incomprehensible reasons. *Simon v. State, supra:* "Although Simon told Officer Allen that he had separated from Telly and was living in his car at a parking lot, which also was supported by Telly's testimony, the jury could have disbelieved that evidence and, instead, believed that Simon was residing at the residence on Rimwood." In other words, the habitual criminal must be believed, but the honest citizen should be disbelieved. Anything to affirm the conviction of a "sex offender."

Furthermore, there is the matter of non-evidence as evidence: the prosecutor did not provide any hard, objective, evidence that showed Petitioner living in another residence: a lease signed by him, a change of address form, utility bills, DNA, photographs, a moving van contract, a landlord. Nothing.

24

Lastly, generally speaking, there is an elephant in the [court]room that everyone evades, is rarely whispered about much less mentioned out loud. Like the proverbial elephant in the room, everyone knows of it, tiptoes around it, but is afraid to openly acknowledge its existence: to put it crudely, it is that jurors can be stupid. This statement may appear as distasteful, as offensive, as vulgar, and so it may be, but it is also unquestionably true and everyone knows it. Every judge, every lawyer, on many occasions, has been faced with a verdict that defied all reason, all comprehension, all evidence, which is why so many attorneys are averse to a jury trial, civil or criminal. Instead, Courts pretend that the people dragged off the street to serve in the jury are, one and all, rational, intelligent, and even well versed in the law, whereas experience occasionally proves otherwise. The irony, of course, is that when one of these same potential jurors is chanced on the street, that same judge or attorney may denigrate that person's IQ or rationality. Yet, *Jackson v. Virginia, supra*, ensures finality with the assumption that a person, simply by being placed in a jury box will be automatically improved in logic and rationality and will experience a sharp rise in IQ. Quite simply, courts of appeal rely on *Jackson v. Virginia* as an excuse to avoid making difficult decisions. The instant case before the Court, however, does not require making a difficult decision at all as to sufficiency of evidence.

The present case illustrates the above in that Petitioner was convicted on a scintilla of evidence. There was *more* than a reasonable doubt present in the case. Indeed, the dearth of evidence against him underscores the fact that the jury was prejudiced by announcement of defendant's previous conviction and present legal standing (i.e., being labeled as a "sex offender").

25

## #11 BILL OF ATTAINDER

The Constitution bans bills of attainder, whether they are directed against an individual person or against a group of people (Hamilton, Alexander, *The Federalist Papers* (#84), Mentor Books, 1961). The sex offender registration act of Texas, and for that matter of all the states, achieves that status and, as such, it is un-Constitutional. Although the law was originally intended as a safeguard for the public, the unintended consequences have subsequently transformed it into a bill of attainder. Objections to the law cannot be waved aside simply by stating that the original intent of the law was non-punitive. The drug thalidomide was never *intended* to have deleterious effects, but the undeniable fact is that taking the drug led to birth defects. No one has ever claimed that the birth defects did not take place, or did not exist, yet persons who defend the sex offender registrations absurdly claim that the deleterious effects do not exist simply because the original intent of the law was not punitive.

The posting the identity and address of individuals who have been labeled "sex offenders" have resulted in well-documented acts of vandalism against such individuals; It has also led to *de facto* segregation into mini-ghettos (Levenson, Jill & Cotter, Leo. (2005) The impact of sex offender residence restrictions: 1,000 feet from danger or one step from absurd? *International Journal of Offender Therapy and Comparative Criminology, 49*, 168-178; Levenson, Jill & Hern, Andrea. Item # 8. (2007) Sex offender restrictions: unintended consequences and community reentry. *Justice Research and Policy, 9*, 59-73. Item # 9. As such, it is a type of incarceration albeit very mild by comparison, but incarceration nonetheless. It has also led to restrictions on employment.

Petitioner himself has been evicted several times from decent apartments when it became known through the official website that he was "a registered sex offender," so that he has had to live in a series of squalid places of residence although he has---not yet---been forced to live under a bridge, as has happened with some individuals. In a sense, it is a type of incarceration.

In the trial, Officer Allen admitted of being aware such occurrences **3RR60-61** and when Petitioner was homeless even the Salvation Army residence for homeless people would not accept him in the middle of a very cold winter because he was a registered "sex offender" **3RR60-61**. It has also led to social ostracism. This occurs even though his sole sexual offence was 30 years ago, and even though he "paid his debt to society," he continues to be punished. *Fleming v. Nestor,* 363 U.S. 603, 80 S. Ct. 1367 (Justice Douglas dissenting): "By smiting a man day after day with slanderous words, by taking away his opportunity to earn a living, you can drain the blood from his veins without even scratching his skin. 'Todays' bill of attainder is broader than the classic form, and not so tall and sharp. There is mental in place of physical torture and confiscation of tomorrow's bread and butter instead of yesterday's land and gold. What is perfectly clear is that hate, fear and prejudice play the same role today, in the destruction of human rights in America that they did in England when a frenzied mob of lords, judges, bishops and shoemakers turned the Titus Oates blacklist into a hangman's record."

## #12 CONDITIONS OF PROBATION & PAROLE ARE UNCONSTITUTIONAL

Upon denial of the Petition for Discretionary Review, Defendant had turned himself in to the local agency of adult supervision. At that point, the staff was not aware that Defendant was now in their case load. Nonetheless, he was given a set of rules the following day, February 12, 2013, specifically tailored to sex offenders. [see item # 6] The offence for which Petitioner was found guilty was a nonsexual offence, yet he was put on restrictions that are typical of someone convicted of a sex offence. Note that in *Tamez v. State*, 534 SW 2d 686; *Johnson v. State*, 672 SW 2d 621; *U. S. v. Mills*, 959 F. 2d 516 and *Simpson v. State* 772 SW 2d 276 the higher Courts in Texas have ordained that conditions of probation must be specifically relevant to the offence.

When he was placed on parole in January 2014, he was given identically harsh restrictions and was furthermore placed on an ankle monitor, so that someone aware of his conditions and of his monitor would have concluded that he was an extremely dangerous criminal, a serial killer perhaps, instead of being guilty of a victimless, administrative, bureaucratic offence, akin to the tearing off of the tag from a mattress.

And regardless of his present circumstances now, this issue must be addressed. First, as happened before, the same restrictions can be arbitrarily imposed *at any time, for any reason* (and only someone who has been under the thumb of parole officers or probation officers can attest to their self-righteous arrogance). Secondly, if and when he is placed back on parole, he will have the same restrictions as before due to his being "a convicted sex offender." And since his sentence has already expired halfway, it is beneficial to deal with the topic now instead of waiting for the imposition of the

restrictions; since the courts move at a glacial pace his sentence would be finished by the time that the Court of Appeals, or the Criminal Court of Appeals (or, conceivably, even the trial Court) came to a decision on the matter.

Among the requirements were the following:

K. Defendant may not establish a romantic relationship without the approval of the Probation Officer (PO).

U. Abide by all "Holiday Notice" rules. These were verbally explained to the Defendant to be a prohibition against displaying religious ornaments and signs which could be visible from outside the home. Presumably, signs stating "Jesus has Risen," or, "Happy Easter" during Easter, and "Merry Christmas," or "Peace on Earth" during December would simply be too attractive to children, who would then gravitate in droves to the sex offender's home, thereby becoming potential victims.

I (a) Defendant may not own a computer which does not have internet access. The irony, of course, is that a computer not having internet access has no access to internet pornographic sites. Likewise, Defendant may not use a public library's computer, even though, again ironically, they are blocked from such similar sites.

Said restrictions violate Defendant's constitutional right of freedom of religious expression and worship, freedom of assembly and, freedom of the press, all found in the First Amendment of the United States Constitution.

Approximately a week afterwards Parole Officer Franco Olvera went to Defendant's apartment, did not find him there at the time, called him, and ultimately ordered him to return from Walmart, where Defendant had been grocery shopping, and meet him at his residence. Upon entering and doing a thorough inspection of the

premises, Mr. Olvera concluded that defendant was not living there. This conclusion was based on (a) there was dirt in places inside the apartment (b) there were few groceries and eating utensils (c) there were cobwebs inside the bathtub. When pressed for an answer, Defendant admitted that he had been shopping for food and plastic utensils that had run out, that he usually ate at fast food places that had "dollar menus." He also admitted to babysitting his biological children when they returned from school and helping them with their homework (they are straight-A students) while their mother worked and attended college, as well as instilling in them respect for their mother and their teachers. In exchange, defendant could take a hot shower and have a snack in their home, since his own shower was defective and had not been repaired by the landlord despite repeated requests.

At this point, it must be mentioned that Petitioner lived in a "dump." Exceedingly few landlords will rent to sex offenders to the point that some are even forced out to be homeless and to live under bridges, or, just simply decide to disappear and go underground, whereupon they lead a relatively normal life. Those landlords that do rent almost always do so in disreputable neighborhoods, sometimes in decrepit dwellings. In a sense, "sex offenders" are relegated to mini-ghettos. Items # 14 & 15 are pictures of where the Petitoner was living and evicted from once it became known of his legal status through the registry. Items # 16 & 17 are pictures of where he has/is being forced to live.

Approximately on March 6, 2013, Petitioner was summoned to the PO's office. A report had been forwarded to the Court in the interim of which Defendant was not informed and, therefore, could not give his version of the visit. In retaliation for not

30

having enough groceries at home, having a dirty apartment and taking showers elsewhere, additional, harsh, penalties were imposed, to wit, [see item # 7]

---prohibition against having any contact with his biological children,

---attend a "sex offender treatment program," even though for many years he attended said program while on parole,

---periodically submit to polygraph examinations,

---avoid places where children might congregate,

This could be considered to be a violation of the much neglected **9th Amendment** to the United States Constitution, an amendment which, paradoxically, is often overlooked in legal matters precisely because it is not specific in enumerating Constitutional rights, which in this particular instance could be construed as the right to maintain familial integrity (although there are other interpretations; cf. Randy Barnett, "The Ninth Amendment: It Means What It Says," *Texas Law Review*, *85*, 2006).

Petitioner has tried very hard to be a productive, beneficial, influence in his children's lives, particularly in their schoolwork, and they are one of the few joys that are left to him. Furthermore, said restriction penalized the children, who found the sudden separation to be traumatic; not only was such a separation detrimental to their emotional state of mind, but it was also detrimental from a scholastic standpoint (the punitive aspect of sex offender registration on "sex offenders'" families is a known fact: Levenson, Jill & Tewksbury, Richard. (2007) Collateral damage: family members of registered sex offenders. *American Journal of Criminal Justice, 34*, 54-68; item # 11). Incidentally, an automatic investigation of the children by the Child Protective Services was instituted, thanks to Mr. Olvera. The caseworker, Nadene Long, found no evidence of neglect or

31

abuse; instead, she found the children to be highly intelligent and healthy, highly motivated towards school and respectful of parents and teachers, and aware of what measures to take in case of emergencies. She considered the referral to have been a waste of her time. It is difficult to reconcile the rationale for this separation of children from their father as a result of the father not having enough groceries in his apartment at the time, or having cobwebs in his bathtub. Not to mention irrelevant to the original charge of failure to register.

As to the polygraph, two points need be made. One, it is an obvious violation of the **5th Amendment** to the United States Constitution, against self-incrimination. Two, on the other hand, the results of a polygraph examination can be, and have been, used punitively by the State in order to incarcerate a person (*Marcum v. State*, 983 SW 2d 762; *Leonard v. State*, 385 SW 3d 570). Four, proof that the polygraph's intent is simply punitive and judicial is the fact that no therapist is hired by the State who does not agree to include the mandatory polygraph as part of its "therapy," even though there is a wide plethora of types of therapies. Lastly, polygraphs are notoriously unreliable.

In regards to the rule of avoiding places where children might congregate, the regulation is absurdly vague since children can be found in the sidewalks, in the malls, in the parks, in the libraries, in downtown, in movies, in McDonald's, in Wendy's, in Pizza Hut, in museums, in theaters, in Whataburger, in Taco Cabana, in pet stores, in clothing shops, in ice cream shops, in yogurt shops, in Starbucks, in planetariums, in Sea World, in Six Flags, in lakes, in football games, in baseball games, in hockey games, in basketball games, in sport stores, etc. Ironically, the only place where children would not

be found would be in stripper clubs and shops that sell pornography, neither place being of interest or intent to patronize by Petitioner.

Lastly, Petitioner has a long history of carrying out scientific research and of involvement in literary endeavors [see item # 10]. To this end, he requires the use of computers, which are ubiquitous and almost mandatory for these purposes: e-mails and submissions to journal and book publishers, for example. Also, the computer is also used for storing information, collating, and as a document creation. Restriction of use would violate his **1st Amendment** right. Furthermore, restriction on the use of computers hobbled Defendant in the preparation of the original writ, in so far as he was unable to obtain legal documents, ask legal opinions, thereby violating his rights under the **5th, 6th** and **14th Amendments.**

In January 2014, Petitioner was placed on parole. He received the same restrictions as those above with the additional increase in: (1) inability to attend church services due to mandatory "lockdown" during weekends, thereby violating his Constitutional right to religious worship (2) he was placed on ankle monitor and his movements restricted and monitored (3) he was forbidden to enter libraries, bookstores and movie theaters, thereby violating the **1st Amendment**. Furthermore, he was forbidden to see movies in movie theaters at any time, again violating his **1st Amendment** rights. Objections were arrogantly ignored by the parole bureaucrats, as usual.

Even should Petitioner find himself not on parole or probation, this ground is still applicable in this writ since he can have those conditions imposed on him on any future instance of probation and/or parole.

**#13 CRUEL AND UNUSUAL PUNISHMENT**

The standard for the **8th Amendment** prohibition against cruel and unusual punishment is twofold: (1) either a punishment was considered cruel and unusual at the time of the Bill of Rights compilation, or, (2) it is inconsistent with modern day standards. *Ford v. Wainwright,* 477 U.S. 399, 405, 106 S. Ct. 2595, 91 Le D 2d 335. Petitioner believes that both instances apply here.

At cursory glance, it may seem strange to claim that Petitioner received cruel and unusual punishment in this case. However, going to prison for two years for supposedly having changed addresses without notification for three weeks is, indeed, cruel and unusual punishment. There was no one victimized; there was no loss of money, no embezzlement, no counterfeiting; no arson; there was no loss of property or damage to property; there were no drugs involved, no use, transportation, selling, or manufacturing. Furthermore, at no point did the Petitioner try to drop under the radar and go underground, which would have been easy; he tried to keep to the law by contacting Officer Allen; instead of being given kudos for trying to keep to the letter of the law, at a stressful period in his life, he was instead arrested and charged with a felony.

Additionally, although it may furthermore appear to the uninitiated that being on probation is a mild form of punishment, it can be seen from the above that the special harsh restrictions imposed on "sex offenders" are actually cruel and unusual punishment. *Practically every one of the Constitutional rights in the Bill of Rights has been negated here.* Incarcerated prisoners have a greater degree of protection of their Constitutional rights than the Petitioner had during probation or parole! No matter how the State spins it,

either in the form of a parole bureaucrat, or of counsel for the State, being deprived of so many Constitutional rights *is* cruel and unusual punishment.

The sex offender registry law is conducive to cruel and unusual punishment on three levels. On one level, the range of punishment is excessive for what is, as has been stated so many times in this petition, for all intents and purpose, an administrative, victimless crime. This is particularly so if the period of non-registration is a matter of days or weeks and not years.

On a second level, the registry law serves as a peg for attaching other, additional laws that are themselves most certainly punitive in that they restrict a person's liberty more and more by increments. Using the registry as a basis, local and state government entities have passed laws stating that anyone found in those registries may not rent domiciles, may not enter certain tax-supported public properties, live in certain neighborhoods, utilize certain public services, etc. (Petitioner, for example, was fined in 2012 for picking up his son from a swimming pool after swimming lessons because of a Live Oak municipal law). At times it seems as if communities are in a competition as to which one will be the most innovative or pass the more restrictions. For all intents and purpose they are bills of attainder attached to a sex offender registry bill of attainder. As usual, these additional laws are passed with a preamble that they are for the purpose of ensuring public safety, but the effect is indisputably punitive and, if honestly admitted, were also intended that way. The thalidomide birth defects did take place.

Just as a member of an audience will cringe at watching a Chinese contortionist, so has Petitioner cringed at reading the elaborate verbal contortions to deny *ex post facto* status to sex offender registries, e.g., *Smith v. Doe, supra; Reynolds v. U. S.* Writing a

concurring opinion, Justice Souter in the former nevertheless cites his misgivings: "The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones." Petitioner would suggest that if there is any question as to the real punitive basis for sex offender registries---not to mention all the other legal restrictions pegged on to the SORAs---then one only has to listen to the hatred in the voices of those persons introducing, or supporting, said legislations. And the Court should furthermore consider the following: Statute 103.001 was enacted to give a financial compensation for those wrongly convicted of a crime; among its provisions is a separate one that allows financial compensation for those who, because of a wrongful conviction, have had to report to a sex offender registry, which begs the question: if being in a sex offender registry is not punitive then why did the State legislature legislate financial compensation? The answer is obvious: because being in such a registry *is* punitive.

Incidentally, someone with verbal virtuosity could easily form a preamble to a law that amputates a jaywalker's legs, or cuts off a thief's hands, and make it sound as if the law was not punitive, but simply for the protection of the public.

Another question that demands an answer is: if the safety of the public is really the issue, why are there no registries for convicted thieves, or convicted murderers? Indeed, how is a statutory "rapist" or an exhibitionist more dangerous than a murderer?

On the third level is the matter of having his Constitutional rights being thrown out the window through the conditions of parole and probation. How is being prohibited from being with his own children not cruel and unusual punishment? Again, not being a licensed attorney, Petitioner would dearly love to learn.

## CONCLUSION

To reiterate the obvious, (true) sexual molestation of a child, and rape of an adult, are both heinous crimes that must be punished and should be punished harshly. No one is arguing otherwise. But frequently, what passes as "sex offenders" are persons who have not committed either offense, yet are treated and classified as if they had.

Additionally, granted that the above offenses occur, no one can deny that the country has gone through a hysteria in regards to sex offenses, said hysteria exacerbated by the mass media, particularly whenever a particularly lurid offence occurs, so that rational thinking has dissipated in this climate over this topic (Mary Pride, *The Child Abuse Industry,* Crossway Books, 1986).

Again, this case conclusively illustrates, as probably few others could, that being announced to the jury at the very beginning of a trial as a "sex offender" *guarantees* a guilty verdict---regardless of the lack of evidence. "Sentence first---verdict afterwards," is the motto in the courtroom in *Alice in Wonderland* and should be formally appended to this law. All a prosecutor has to do in order to ensure a conviction is utter three words: "convicted sex offender." This flaw is inherent in the law itself, by denying the Defendant a fair trial and is, therefore, *ipso facto,* un-Constitutional. "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the

37

administration of justice suffers when any accused is treated unfairly." *Brady v. Maryland,* 373, U. S. 83, 83 S. Ct. 1194.

Then, the question of finality comes into play here as well. In regards to habeas corpus, for example, the matter of exhausted and unexhausted claims, as well as "mixed petitions, was ultimately resolved with the principal concern of the Courts achieving finality. *Coleman v. Thompson,* 501 U. S. 722, 111 s. Ct. 2546. Likewise, AEDPA was instituted for the purpose of finality. *Doe v. Menefee,* 391 F. 3d 147. And, similarly, a defendant cannot be retried for the same offense that an appeal court has vacated and remanded due to insufficiency of evidence, again, for the sake of achieving finality. *Greene v. Massey,* 437 U. S. 19, 98 S .Ct. 2151. But, for so-called "sex offenders" there is no finality. The punishments keep coming and coming in new and novel ways, long after the original law was passed and time served. Every convicted "sex offender" is Sisyphus.

Lastly, well-documented instances of vigilante acts have occurred from time to time against persons who were found to be living in a community, as a result of there being a sex offender registry, and that is on top of numerous local bills of attainder.

As a result, thousands of individuals who have been labeled as a "sex offender" and who paid their debt to society, have made the rational choice to go underground and assume a different identity since they feel that society has made living a normal law-abiding life to be an impossibility. And why should they not do so? It is so simple. By taking a few elementary precautions and assuming a new identity, a person does not have to live under a bridge exposed to the elements, or live in a dump where he will be forever subject to persecution by all and sundry. To conform to what is demanded is simply

absurd, a no-win scenario. In this regard, it is amusing, in a perverse way, to read the interpretations as to why so many thousands have "disappeared" when the high courts have discussed SORAs, e.g., in *Carr v. U.S., supra; Reynolds v. U. S., supra; U. S. v. Kebodeaux, supra.* The implied reason by the justices has been simply delusional as to why they dropped out of sight: that they have done so in order to commit additional crimes---as if being in a registry somehow eliminates the impulse to commit a crime. Those defenders of registries have the delusional fantasy that "sex offenders" who have avoided registration are now lurking around corners and in shadows everywhere looking for victims. In reality, they are now living ordinary, mundane, boring, law-abiding lives. Finally.

And, in the end, Petitioner is faced with the uncomfortable question: why, indeed, should he not also simply go underground, disappear, and thereby lead a normal, stress-free, mundane otherwise law-abiding life? It would be so easy. The truth of the matter is that, try as he might, he cannot think of a good, rational reason.


WHEREFORE, PREMISES CONSIDERED, Petitioner prays for relief from the Court. Specifically, Petitioner asks the Court to: **(1)** void and nullify his conviction **(2)** declare the law to be un-Constitutional and thereby null and void it **(3)** reform the Grand Jury process **(4)** limit the prosecution's *voi dire* questioning in all future trials for all Defendants, and, **(5)** declare the special conditions of parole and probation that pertain to all "sex offenders" to be un-Constitutional and thereby null and void them **(6)** order that Petitioner not have to register in the sex offender registry.

39

I certify that the above is an accurate and correct version of the facts and that a copy has been sent to the State via regular mail.

_____

Armando Simón, *pro se*

211 E. Elmira Apt #9

San Antonio, Texas 78212

Date: March 24/2015

STATE OF Texas
COUNTY OF Bexar

Sworn to (or affirmed) and subscribed before me
this 24 day of March 2015, by Armando Simón

_____  C. Carreon
Notary Public's Signature          Notary Name
Personally Known _____ OR  Tdl
Type of Identification Produced

C. CARREON
Notary Public, State of Texas
My Commission Expires
December 09, 2015

40

# SECONDARY APPENDIX

**From:** Dayna Jones <daynaj33@gmail.com>
**To:** countnomis <countnomis@aol.com>
**Subject:** Re: appeal (2110-cr-2132)
**Date:** Mon, Jan 30, 2012 7:30 pm

Armando, I filed the motion for an extension today. I am in trial all this week but I will discuss the issues you raised in your email when I have time. I will tell you that I do not think your preserved the constitutional issues for appeal.

Talk to you soon,
Dayna

Sent from my iPhone

On Jan 30, 2012,
at 2:44 PM, countnomis@aol.com wrote:

> Hello.
>
> First, a friendly
reminder that Feb. 2 is the deadline and that you were going to ask for an extension.
>
> A good friend of mine who is an attorney, though not a
criminal attorney, suggested something which I am doubtful of, but I promised her to pass it on. She believes that the law itself can be challenged Constitutionally on the basis that it makes no provision as to categories of "sex offenders." It lumps together an 18 y/o who had consensual sex with his girlfiend along with a habitual child rapist/killer together with someone who was drunk and urinated in a secluded spot and was seen and tagged as an exhibitionist along with a habitual rapist. I, personally, do not see the Constitutional basis for such a challenge. However, I can see how the original term of "sexual assault" is a misnomer when the sex was described as consensual between myself and a teenage girl 28 years ago and could conceivably be brought into play. Your thoughts?
>
> In regards to the transcript:
>
> (a) If
memory serves, I believe that there is a sentence or two that is missing in Officer Hermosillo's testimony, specifically in Volume 3, pp.76-77. Could we ask the reporter to check on this?
>
> (b) It is unfortunate that the transcript
does not record tone of voice, inflection, or even quote (when quoting someone). My blundering attempt at voi dire was particularly painful to relive; my only consolation is that it would not have made any difference anyway. Once the magic words were uttered: "sex offender" and "sexual assault," it was all over.
>
>
(c) In regards to this last point, in Volume 2, p. 85, lines 3-16, I mention the obvious hostility that the pool of jurors showed once those words were uttered. Do notice that when I asked a few questions I had difficulty in having anyone answer at first. Another matter re voi dire is that in p.95, this was when one of the jurors started sobbing, which further poisoned the well. Even though it is not on the record, I would still want to have it mentioned.
>
> (d) During
closing argument, in Volume 4, I again bring up the matter of hostility based on observable body language. I did not specify that there was one particular juror who looked away with arms crossed throughout my closing argument, but as with the crier, I would like to nevertheless mention it in the brief. One more thing: if memory serves again, there is a sentence missing in page 74. along lines

16-18.
>
> Something I ommitted in my previous letter as to the basis of the
appeal, simply because it was obvious, is that the State did not prove its case
that I had actually established a residence elsewhere. Obviously, I wish this to
be brought up.
>
> Thank you for your attention. Hoping to hear from you
soon, I remain,
>
> Yours truly,
>
> Armando Simon
>
> PS  BTW, and
this has nothing to do with the appeal in my case, I came across a couple of
articles that i found fascinating and which I am forwarding to you because they
happen to deal with your line of work, albeit indirectly. I think that you will
find them absorbing whenever you get around to look them over.
>
<Kassin%20(2008)%20-%20ARLSS%20Chapter.pdf>
> <annual_review_2003.pdf>

From: Dayna Jones <daynaj33@gmail.com>
To: Count Nomis <countnomis@aol.com>
Subject: Fwd: Appeal Draft
Date: Tue, Mar 10, 2015 4:41 pm
Attachments: Appeal.Draft.March.20.2012.pdf (142K)

I am forwarding you the emails that I can see on this issue with my explanations on why Mr. Tocci and I would not put them in an appeal...the error was not properly preserved in the trial record by you or you wanted things raised in the appeal that we thought were frivolous and would lose credibility when we had good issues to argue.

-Dayna
---------- Forwarded message ----------
From: **Dayna Jones**<daynaj33@gmail.com>
Date: Tue, Mar 20, 2012 at 2:55 PM
Subject: Appeal Draft
To: countnomis@aol.com


Armando,
Attached is a ROUGH draft of your appeal. It is due April 3rd.
Although you did do a fairly good job representing yourself, there are a few issues that I need to address with you and explain why all the issues you would like to raise will not and cannot be raised.
1. The issue of the prosecutor bringing up the facts of your previous case: You did not object when it was brought up. I also do not see in the record that any judge ruled on your motion in limine, however a motion in limine is virtually meaningless unless you properly object and raise the issue during the trial. You did not do this. If you don't object at the proper time, you waive the issue for appeal.
2. Prosecutor brought up details of prior case: Although it was a good motion for a mistrial, you failed to object to a document that the State introduced into evidence with details of the previous conviction i.e. the document said the girls age, etc. Because that evidence was before the jury AND because you did not object, the issue was waived.
3. No direct Evidence - this issue is called a "sufficiency of the evidence complain" and I am raising this issue on your behalf.
4. Attacking the Texas approach to grand juries: you failed to raise this issue pre-trial and now you cannot raise it on appeal.
5. Officer Hermosillo's testimony should be thrown out: This should have been addressed pre-trial and at the time that he tstified. You waived this issue on appeal by not properly raising it at the trial level.
6. Excessive punishment: Considering you received probation, an 8th amendment excessive punishment argument is not valid on appeal. Much of the research on this issue that I have done shows that many men who went to trial and were convicted of the same offense received prison sentences.

Your other issues labeled A-C in your letter are also not valid to raise on appeal because they were not properly preserved in the trial court.

I have raised 3 issues all relating to the issue of whether the evidence was sufficient to prove you committed the alleged crime. In order to violate the change of address requirements, the state had to prove you 1. were required to register (which they did) and 2. that you failed to report 7 days before your intended move or 7 days after moving. The law also provides that someone who is homeless must only report once every 30 days and it also provides for people who do not actually move to an intended residence on an anticipated day are required to report only weekly. Neither of these provisions require in person. Thus the state did not prove that you intended to move on any particular date and therefore you did not fail to report 7 days prior. I also do not think they proved you actually changed addresses. Finally, I think you were in compliance with the reporting requirements for homeless people.

However, where I think we still may lose is the fact that after leaving the residence were you required to report in person to state that you were homeless? And then you only had to report monthly after that? I think the law is not exactly clear and will be left to the court's interpretation.

Again, the draft is rough and needs fine tuning, but I wanted to give you time to look over the issues raised before it gets filed on April 3.

Thanks,

Dayna

--
Dayna L. Jones
Law Offices of Dayna L. Jones
206 E. Locust Street
San Antonio, Texas 78212
(210) 255-8525 - Office
(210) 212-2178 - Fax
www.jonesdefense.com
www.sanantoniocriminallawyersblog.com

**NOTICE**
The information contained in this communication is a transmission from the Law Office of Dayna L. Jones, and is information protected by the attorney/client and/or attorney/work product privilege. It, along with any attachments hereto, is also covered by the Electronic communications Privacy Act, 18 U.S.C. Sections 2510-2512.
The Texas Bar Disciplinary Rules requires all Texas lawyers to notify all recipients of e-mail that: (1) e-mail communications are not a secure method of communication; (2) any e-mail that is sent to you or by you may be copied and held by various computers through which it passes as it goes from sender to recipient; (3) a person not participating in our communication may intercept our communications by improperly gaining access your computer or even some computer not connected to either of us through which the e-mail passes.
**END OF NOTICE**


--
Dayna L. Jones
Law Offices of Dayna L. Jones
1800 McCullough Avenue
San Antonio, Texas 78212
(210) 255-8525 - Office
(210) 223-3248 - Fax
www.jonesdefense.com
www.sanantoniocriminallawyersblog.com

**NOTICE**
The information contained in this communication is a transmission from the Law Office of Dayna L. Jones, and is information protected by the attorney/client and/or attorney/work product privilege. It, along with any attachments hereto, is also covered by the Electronic communications Privacy Act, 18 U.S.C. Sections 2510-2512.
The Texas Bar Disciplinary Rules requires all Texas lawyers to notify all recipients of e-mail that: (1) e-mail communications are not a secure method of communication; (2) any e-mail that is sent to you or by you may be copied and held by various computers through which it passes as it goes from sender to recipient; (3) a person not participating in our communication may intercept our communications by improperly gaining access your computer or even some computer not connected to either of us through which the e-mail passes.
**END OF NOTICE**



# Live Oak Police Department

8022 Shin Oak Drive • Live Oak, Texas 78233 • (210) 945-1700 • www.liveoaktx.net

January 27, 2010

Armando Simon

9515 Flaming Run

Helotes, Texas 78203

Mr. Simon:

I had received your letter of complaint from Chief Echols and have conducted an investigation into the incident. The Live Oak Police Department considers all complaints of officer misconduct a serious matter and they are thoroughly investigated. The findings of the investigation are stated below.

The officer observed a vehicle being operated with a defective headlamp which is probable cause for the traffic stop. Upon contacting and identifying you as the driver and running your driver's license it was discovered that you are a registered sex offender. After you were unable to provide a current address the officer continued the investigation in an attempt to make certain that you were meeting your obligation to provide a change of address as directed by law. The officer also wished to check the welfare of the children in your vehicle. Your daughter was asked who you were. When the officer was told you were her father no further questions were asked of her.

During the traffic stop and investigation you were detained a total of 18 minutes and 45 seconds. I believe this to be a reasonable time for the stop and investigation. You were then issued a warning requiring no payment of fine or court action for Defective Headlamp and released.

Your subsequent arrest that evening was obviously due to you not making proper notification of address change to the agency you are required to report to. The arrest had nothing to do with the fact that you were stopped by a Live Oak Police Officer.

After a review and investigation into this incident, I find no wrong doing on the part of the officer. This investigation has been completed and closed. No further action will be taken by the department on this matter.

Respectfully,

Lieutenant Matt Malone

Patrol Division Commander