Justice BREYER delivered the opinion of the Court.
*389 In 1999 a special court-martial convicted Anthony Kebodeaux, a member of the United States Air Force, of a sex offense. It imposed a sentence of three months' imprisonment and a bad conduct discharge. In 2006, several years after Kebodeaux had served his sentence and been discharged, Congress enacted the Sex Offender Registration and Notification Act (SORNA), 120 Stat. 590, 42 U.S.C. § 16901 et seq., a federal statute that requires those convicted of federal sex offenses to register in the States where they live, study, and work. § 16913(a) ;
*2500 18 U.S.C. § 2250(a). And, by regulation, the Federal Government made clear that SORNA's registration requirements apply to federal sex offenders who, when SORNA became law, had already completed their sentences. 42 U.S.C. § 16913(d) (Attorney General's authority to issue regulations); 28 CFR § 72.3 (2012) (regulation specifying application to pre-SORNA offenders).
We here must decide whether the Constitution's Necessary and Proper Clause grants Congress the power to enact SORNA's registration requirements and apply them to a federal offender who had completed his sentence prior to the time of SORNA's enactment. For purposes of answering this question, we assume that Congress has complied with the Constitution's Ex Post Facto and Due Process Clauses. See Smith v. Doe, 538 U.S. 84, 105-106, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (upholding a similar Alaska statute against ex post facto challenge); Supp. Brief for Kebodeaux on Rehearing En Banc in No. 08-51185 (CA5) (not raising any Due Process challenge); Brief for Respondent (same). We conclude that the Necessary and Proper Clause grants Congress adequate power to enact SORNA and to apply it here.
I
As we have just said, in 1999 a special court-martial convicted Kebodeaux, then a member of the Air Force, of a federal *390 sex offense. He served his 3-month sentence; the Air Force released him with a bad conduct discharge. And then he moved to Texas. In 2004 Kebodeaux registered as a sex offender with Texas state authorities. Brief for Respondent 6-7. In 2006 Congress enacted SORNA. In 2007 Kebodeaux moved within Texas from San Antonio to El Paso, updating his sex offender registration. App. to Pet. for Cert. 167a-168a. But later that year he returned to San Antonio without making the legally required sex-offender registration changes. Id., at 169a. And the Federal Government, acting under SORNA, prosecuted Kebodeaux for this last-mentioned SORNA registration failure.
A Federal District Court convicted Kebodeaux of having violated SORNA. See 687 F.3d 232, 234 (C.A.5 2012) (en banc). On appeal a panel of the United States Court of Appeals for the Fifth Circuit initially upheld the conviction. 647 F.3d 137 (2011) (per curiam ). But the Circuit then heard the appeal en banc and, by a vote of 10 to 6, reversed. 687 F.3d, at 234. The court stated that, by the time Congress enacted SORNA, Kebodeaux had "fully served" his sex-offense sentence; he was "no longer in federal custody, in the military, under any sort of supervised release or parole, or in any other special relationship with the federal government." Ibid.
The court recognized that, even before SORNA, federal law required certain federal sex offenders to register. Id., at 235, n. 4. See Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, § 170101, 108 Stat. 2038-2042. But it believed that the pre-SORNA federal registration requirements did not apply to Kebodeaux. 687 F.3d, at 235, n. 4. Hence, in the Circuit's view, Kebodeaux had been "unconditionally let ... free." Id., at 234. And, that being so, the Federal Government lacked the power under Article I's Necessary and Proper Clause to regulate through registration Kebodeaux's intrastate movements. Id., at 234-235. In particular, the court said that *391 after "the federal government has unconditionally let a person free ... the fact that he once committed a crime is not a jurisdictional basis for subsequent regulation and possible criminal prosecution." Ibid. *2501 The Solicitor General sought certiorari. And, in light of the fact that a Federal Court of Appeals has held a federal statute unconstitutional, we granted the petition. See, e.g., United States v. Morrison, 529 U.S. 598, 605, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) ; United States v. Edge Broadcasting Co., 509 U.S. 418, 425, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993).
II
We do not agree with the Circuit's conclusion. And, in explaining our reasons, we need not go much further than the Circuit's critical assumption that Kebodeaux's release was "unconditional," i.e., that after Kebodeaux's release, he was not in "any ... special relationship with the federal government." 687 F.3d, at 234. To the contrary, the Solicitor General, tracing through a complex set of statutory cross-references, has pointed out that at the time of his offense and conviction Kebodeaux was subject to the federal Wetterling Act, an Act that imposed upon him registration requirements very similar to those that SORNA later mandated. Brief for United States 18-29.
Congress enacted the Wetterling Act in 1994 and updated it several times prior to Kebodeaux's offense. Like SORNA, it used the federal spending power to encourage States to adopt sex offender registration laws. 42 U.S.C. § 14071(i) (2000 ed.) ; Smith, supra, at 89-90, 123 S.Ct. 1140. Like SORNA, it applied to those who committed federal sex crimes. § 14071(b)(7)(A). And like SORNA, it imposed federal penalties upon federal sex offenders who failed to register in the States in which they lived, worked, and studied. §§ 14072(i)(3)-(4).
In particular, § 14072(i)(3) imposed federal criminal penalties upon any "person who is ... described in section 4042(c)(4) of title 18, and knowingly fails to register in any *392 State in which the person resides." The cross-referenced § 4042(c)(4) said that a "person is described in this paragraph if the person was convicted of" certain enumerated offenses or "[a]ny other offense designated by the Attorney General as a sexual offense for purposes of this subsection." 18 U.S.C. § 4042(c)(4). In 1998 the Attorney General "delegated this authority [to designate sex offenses] to the Director of the Bureau of Prisons." Dept. of Justice, Bureau of Prisons, Designation of Offenses Subject to Sex Offender Release Notification, 63 Fed.Reg. 69386. And that same year the Director of the Bureau of Prisons "designate[d]" the offense of which Kebodeaux was convicted, namely the military offense of "carnal knowledge" as set forth in Article 120(B) of the Code of Military Justice. Id., at 69387 See 28 CFR § 571.72(b)(2) (1999). A full reading of these documents makes clear that, contrary to Kebodeaux's contention, the relevant penalty applied to crimes committed by military personnel.
Moreover, a different Wetterling Act section imposed federal criminal penalties upon any "person who is ... sentenced by a court martial for conduct in a category specified by the Secretary of Defense under section 115(a)(8)(C) of title I of Public Law 105-119, and knowingly fails to register in any State in which the person resides." 42 U.S.C. § 14072(i)(4) (2000 ed.). The cross-referenced section, § 115(a)(8)(C), said that the "Secretary of Defense shall specify categories of conduct punishable under the Uniform Code of Military Justice which encompass a range of conduct comparable to that described in [certain provisions of the Violent Crime Control and Law Enforcement Act of 1994], and such other conduct as the Secretary deems appropriate." 1998 Appropriations Act, § 115(a)(8)(C)(i), 111 Stat. 2466. See note following *2502 10 U.S.C. § 951 (2000 ed.). The Secretary had delegated certain types of authority, such as this last mentioned "deem[ing]" authority, to an Assistant Secretary of Defense. DoD Directive 5124.5, p. 4 (Oct. 31, 1994). And in December 1998 *393 an Assistant Secretary, acting pursuant to this authority, published a list of military crimes that included the crime of which Kebodeaux was convicted, namely Article 120(B) of the Uniform Code of Military Justice. App. to Pet. for Cert. 171a-175a. The provision added that "[c]onvictions ... shall trigger requirements to notify state and local law enforcement agencies and to provide information to inmates concerning sex offender registration requirements." Id., at 175a. And, the provision says (contrary to Kebodeaux's reading, Brief for Respondent 57), that it shall "take effect immediately." It contains no expiration date. App. to Pet. for Cert. 175a.
We are not aware of any plausible counterargument to the obvious conclusion, namely that as of the time of Kebodeaux's offense, conviction and release from federal custody, these Wetterling Act provisions applied to Kebodeaux and imposed upon him registration requirements very similar to those that SORNA later imposed. Contrary to what the Court of Appeals may have believed, the fact that the federal law's requirements in part involved compliance with state-law requirements made them no less requirements of federal law. See generally United States v. Sharpnack, 355 U.S. 286, 293-294, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958) (Congress has the power to adopt as federal law the laws of a State and to apply them in federal enclaves); Gibbons v. Ogden, 9 Wheat. 1, 207-208, 6 L.Ed. 23 (1824) ("Although Congress cannot enable a State to legislate, Congress may adopt the provisions of a State on any subject.... The act [adopts state systems for regulation of pilots] and gives [them] the same validity as if its provisions had been specially made by Congress").
III
Both the Court of Appeals and Kebodeaux come close to conceding that if, as of the time of Kebodeaux's offense, he was subject to a federal registration requirement, then the Necessary and Proper Clause authorized Congress to modify *394 the requirement as in SORNA and to apply the modified requirement to Kebodeaux. See 687 F.3d, at 234-235, and n. 4 ; Tr. of Oral Arg. 38-39. And we believe they would be right to make this concession.
No one here claims that the Wetterling Act, as applied to military sex offenders like Kebodeaux, falls outside the scope of the Necessary and Proper Clause. And it is difficult to see how anyone could persuasively do so. The Constitution explicitly grants Congress the power to "make Rules for the ... Regulation of the land and naval Forces." Art. I, § 8, cl. 14. And, in the Necessary and Proper Clause itself, it grants Congress the power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers" and "all other Powers" that the Constitution vests "in the Government of the United States, or in any Department or Officer thereof." Id ., cl. 18.
The scope of the Necessary and Proper Clause is broad. In words that have come to define that scope Chief Justice Marshall long ago wrote:
"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819).
*2503 As we have come to understand these words and the provision they explain, they "leav[e] to Congress a large discretion as to the means that may be employed in executing a given power." Lottery Case, 188 U.S. 321, 355, 23 S.Ct. 321, 47 L.Ed. 492 (1903). See Morrison, 529 U.S., at 607, 120 S.Ct. 1740. The Clause allows Congress to "adopt any means, appearing to it most eligible and appropriate, which are adapted to the end to be accomplished and consistent with the letter and spirit of the Constitution." James Everard's Breweries v. Day, 265 U.S. 545, 559, 44 S.Ct. 628, 68 L.Ed. 1174 (1924).
The Constitution, for example, makes few explicit references to federal criminal law, but the Necessary and Proper *395 Clause nonetheless authorizes Congress, in the implementation of other explicit powers, to create federal crimes, to confine offenders to prison, to hire guards and other prison personnel, to provide prisoners with medical care and educational training, to ensure the safety of those who may come into contact with prisoners, to ensure the public's safety through systems of parole and supervised release, and, where a federal prisoner's mental condition so requires, to confine that prisoner civilly after the expiration of his or her term of imprisonment. See United States v. Comstock, 560 U.S. 126, 136-137, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010).
Here, under the authority granted to it by the Military Regulation and Necessary and Proper Clauses, Congress could promulgate the Uniform Code of Military Justice. It could specify that the sex offense of which Kebodeaux was convicted was a military crime under that Code. It could punish that crime through imprisonment and by placing conditions upon Kebodeaux's release. And it could make the civil registration requirement at issue here a consequence of Kebodeaux's offense and conviction. This civil requirement, while not a specific condition of Kebodeaux's release, was in place at the time Kebodeaux committed his offense, and was a consequence of his violation of federal law.
And Congress' decision to impose such a civil requirement that would apply upon the release of an offender like Kebodeaux is eminently reasonable. Congress could reasonably conclude that registration requirements applied to federal sex offenders after their release can help protect the public from those federal sex offenders and alleviate public safety concerns. See Smith, 538 U.S., at 102-103, 123 S.Ct. 1140 (sex offender registration has "a legitimate nonpunitive purpose of 'public safety, which is advanced by alerting the public to the risk of sex offenders in their community' "). There is evidence that recidivism rates among sex offenders are higher than the average for other types of criminals. See Dept. of Justice, Bureau of Justice Statistics, P. Langan, E. Schmitt, &
*396 M. Durose, Recidivism of Sex Offenders Released in 1994, p. 1 (Nov. 2003) (reporting that compared to non-sex offenders, released sex offenders were four times more likely to be rearrested for a sex crime, and that within the first three years following release 5.3% of released sex offenders were rearrested for a sex crime). There is also conflicting evidence on the point. Cf. R. Tewsbury, W. Jennings, & K. Zgoba, Final Report on Sex Offenders: Recidivism and Collateral Consequences (Sept. 2011) (concluding that sex offenders have relatively low rates of recidivism, and that registration requirements have limited observable benefits regarding recidivism). But the Clause gives Congress the power to weigh the evidence and to reach a rational conclusion, for example, that safety needs justify postrelease registration rules. See Lambert v. Yellowley, 272 U.S. 581, 594-595, 47 S.Ct. 210, 71 L.Ed. 422 (1926) (upholding congressional statute *2504 limiting the amount of spirituous liquor that may be prescribed by a physician, and noting that Congress' "finding [regarding the appropriate amount], in the presence of the well-known diverging opinions of physicians, cannot be regarded as arbitrary or without a reasonable basis"). See also Gonzales v. Raich, 545 U.S. 1, 22, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) ("In assessing the scope of Congress' authority under the Commerce Clause, we stress that the task before us is a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding"). See also H.R.Rep. No. 109-218, pt. 1, pp. 22, 23 (2005) (House Report) (citing statistics compiled by the Justice Department as support for SORNA's sex offender registration regime).
At the same time, "it is entirely reasonable for Congress to have assigned the Federal Government a special role in ensuring compliance with SORNA's registration requirements by federal sex offenders-persons who typically would have spent time under federal criminal supervision." Carr v. United States, 560 U.S. 438, ----, 130 S.Ct. 2229, 176 L.Ed.2d 1152 (2010). The Federal *397 Government has long kept track of former federal prisoners through probation, parole, and supervised release in part to prevent further crimes thereby protecting the public against the risk of recidivism. See Parole Act, 36 Stat. 819; Probation Act, ch. 521, 43 Stat. 1259; Sentencing Reform Act of 1984, ch. II, 98 Stat. 1987. See also 1 N. Cohen, The Law of Probation and Parole §§ 7:3, 7:4 (2d ed. 1999) (principal purposes of postrelease conditions are to rehabilitate the convict, thus preventing him from recidivating, and to protect the public). Neither, as of 1994, was registration particularly novel, for by then States had implemented similar requirements for close to half a century. See W. Logan, Knowledge as Power: Criminal Registration and Community Notification Laws in America 30-31 (2009). Moreover, the Wetterling Act took state interests into account by, for the most part, requiring released federal offenders to register in accordance with state law. At the same time, the Wetterling Act's requirements were reasonably narrow and precise, tying time limits to the type of sex offense, incorporating state-law details, and relating penalties for violations to the sex crime initially at issue. See 42 U.S.C. § 14071(b) (2000 ed.).
The upshot is that here Congress did not apply SORNA to an individual who had, prior to SORNA's enactment, been "unconditionally released," i.e., a person who was not in "any ... special relationship with the federal government," but rather to an individual already subject to federal registration requirements that were themselves a valid exercise of federal power under the Military Regulation and Necessary and Proper Clauses. But cf. post, at 2509 - 2510 (SCALIA, J., dissenting).
SORNA, enacted after Kebodeaux's release, somewhat modified the applicable registration requirements. In general, SORNA provided more detailed definitions of sex offenses, described in greater detail the nature of the information registrants must provide, and imposed somewhat different limits upon the length of time that registration *398 must continue and the frequency with which offenders must update their registration. 42 U.S.C. §§ 16911, 16913 - 16916 (2006 ed. and Supp. V). But the statute, like the Wetterling Act, used Spending Clause grants to encourage States to adopt its uniform definitions and requirements. It did not insist that the States do so. See §§ 16925(a), (d) (2006 ed.) ("The provisions of this subchapter *2505 that are cast as directions to jurisdictions or their officials constitute, in relation to States, only conditions required to avoid the reduction of Federal funding under this section").
As applied to an individual already subject to the Wetterling Act like Kebodeaux, SORNA makes few changes. In particular, SORNA modified the time limitations for a sex offender who moves to update his registration to within three business days of the move from both seven days before and seven days after the move, as required by the Texas law enforced under the Wetterling Act. Compare 42 U.S.C. § 16913(c) with App. to Pet. for Cert. 167a-168a. SORNA also increased the federal penalty for a federal offender's registration violation to a maximum of 10 years from a maximum of 1 year for a first offense. Compare 18 U.S.C. § 2250(a) with 42 U.S.C. § 14072(i) (2000 ed.). Kebodeaux was sentenced to one year and one day of imprisonment. For purposes of federal law, SORNA reduced the duration of Kebodeaux's registration requirement to 25 years from the lifetime requirement imposed by Texas law, compare 42 U.S.C. § 16915(a) (2006 ed.) with App. to Pet. for Cert. 167a, and reduced the frequency with which Kebodeaux must update his registration to every six months from every 90 days as imposed by Texas law, compare 42 U.S.C. § 16916(2) with App. to Pet. for Cert. 167a. And as far as we can tell, while SORNA punishes violations of its requirements (instead of violations of state law), the Federal Government has prosecuted a sex offender for violating SORNA only when that offender also violated state-registration requirements.
*399 SORNA's general changes were designed to make more uniform what had remained "a patchwork of federal and 50 individual state registration systems," Reynolds v. United States, 565 U.S. ----, ----, 132 S.Ct. 975, 978, 181 L.Ed.2d 935 (2012), with "loopholes and deficiencies" that had resulted in an estimated 100,000 sex offenders becoming "missing" or "lost," House Report 20, 26. See S.Rep. No. 109-369, pp. 16-17 (2006). See also Jinks v. Richland County, 538 U.S. 456, 462-463, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003) (holding that a statute is authorized by the Necessary and Proper Clause when it "provides an alternative to [otherwise] unsatisfactory options" that are "obviously inefficient"). SORNA's more specific changes reflect Congress' determination that the statute, changed in respect to frequency, penalties, and other details, will keep track of more offenders and will encourage States themselves to adopt its uniform standards. No one here claims that these changes are unreasonable or that Congress could not reasonably have found them "necessary and proper" means for furthering its pre-existing registration ends.
We conclude that the SORNA changes as applied to Kebodeaux fall within the scope Congress' authority under the Military Regulation and Necessary and Proper Clauses. The Fifth Circuit's judgment to the contrary is reversed, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.
Chief Justice ROBERTS, concurring in the judgment.
I agree with the Court that Congress had the power, under the Military Regulation and Necessary and Proper Clauses of Article I, to require Anthony Kebodeaux to register as a sex offender. The majority, having established that premise and thus resolved the case before us, nevertheless goes on to discuss the general public safety benefits of the registration requirement. Ante, at 2503 - 2504. Because that *2506 analysis is beside the point in this case, I concur in the judgment only. *400 While serving in the Air Force, Kebodeaux violated the Uniform Code of Military Justice by having sexual relations with a minor. A special court-martial convicted him. As relevant here, that conviction had two consequences: First, Kebodeaux was sentenced to confinement for three months. And second, as the majority describes, he was required to register as a sex offender with the State in which he resided and keep that registration current; failure to do so would subject him to federal criminal penalties. Ante, at 2501 - 2502.
In the same way that Congress undoubtedly had the authority to impose the first consequence for a violation of military rules, it also had the authority to impose the second. The Constitution gives Congress the power "[t]o make Rules for the Government and Regulation of the land and naval Forces." Art. I, § 8, cl. 14. And, under the Necessary and Proper Clause, Congress can give those rules force by imposing consequences on members of the military who disobey them. See McCulloch v. Maryland, 4 Wheat. 316, 416, 4 L.Ed. 579 (1819) ("All admit that the government may, legitimately, punish any violation of its laws; and yet, this is not among the enumerated powers of Congress."). A servicemember will be less likely to violate a relevant military regulation if he knows that, having done so, he will be required to register as a sex offender years into the future.
It is this power, the power to regulate the conduct of members of the military by imposing consequences for their violations of military law, that supports application of the federal registration obligation to Kebodeaux. As the Court explains, the Wetterling Act was in force when Kebodeaux committed the original offense, and applied to him as soon as the special court-martial rendered its verdict. See ante, at 2501 - 2502. Congress later, in enacting the Sex Offender Registration and Notification Act (SORNA), modified the registration regime in place under the Wetterling Act. But as applied to Kebodeaux here (the relevant inquiry in this as-applied challenge), those changes were insignificant; their *401 only effect was that Kebodeaux received a day more than he could have received for the same conduct had the Wetterling Act remained in force. See ante, at 2505 (describing SORNA's effect on Kebodeaux's registration obligations); compare post, at 2514 - 2515, n. 3 (THOMAS, J., dissenting) (discussing changes that did not affect Kebodeaux). Whatever other constitutional concerns might attach to such a change, as a question of Article I power it was permissible. Just as the Federal Government may, under the Necessary and Proper Clause, alter the conditions of a federal prisoner's confinement or adjust the timing and location of drug tests required of a federal convict, so too could it make slight modifications to a previously imposed registration obligation.
The majority says, more or less, the same thing. Ante, at 2503, 2505. But sandwiched between its discussion of the basis for Congress's power and its discussion of the inconsequential nature of the changes is a discussion of benefits from the registration system. Along with giving force to military regulations, the majority notes, Congress could also have "reasonably conclude [d] that registration requirements ... help protect the public from ... federal sex offenders and alleviate public safety concerns." Ante, at 2503.
Maybe so, but those consequences of the registration requirement are irrelevant for our purposes. Public safety benefits are neither necessary nor sufficient to a proper exercise of the power to regulate *2507 the military. What matters-all that matters-is that Congress could have rationally determined that "mak[ing] the civil registration requirement at issue here a consequence of Kebodeaux's offense" would give force to the Uniform Code of Military Justice adopted pursuant to Congress's power to regulate the Armed Forces. Ibid .
Ordinarily such surplusage might not warrant a separate writing. Here, however, I worry that incautious readers will think they have found in the majority opinion something they would not find in either the Constitution or any prior *402 decision of ours: a federal police power. The danger of such confusion is heightened by the fact the Solicitor General adopted something very close to the police power argument, contending that "the federal government has greater ties to former federal sex offenders than it does to other members of the general public," and can therefore impose restrictions on them even years after their unconditional release simply to "serve [ ] ... public-protection purposes." Brief for United States 34-35.
I write separately to stress not only that a federal police power is immaterial to the result in this case, but also that such a power could not be material to the result in this case-because it does not exist. See United States v. Morrison, 529 U.S. 598, 618-619, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (" '[W]e always have rejected readings of ... the scope of federal power that would permit Congress to exercise a police power' " (quoting United States v. Lopez, 514 U.S. 549, 584-585, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (THOMAS, J., concurring))).
Our resistance to congressional assertions of such a power has deep roots. From the first, we have recognized that "the powers of the government are limited, and that its limits are not to be transcended." McCulloch, 4 Wheat., at 420-421. Thus, while the Necessary and Proper Clause authorizes congressional action "incidental to [an enumerated] power, and conducive to its beneficial exercise," Chief Justice Marshall was emphatic that no "great substantive and independent power" can be "implied as incidental to other powers, or used as a means of executing them." Id., at 418, 411; see also Gibbons v. Ogden, 9 Wheat. 1, 195, 6 L.Ed. 23 (1824) ("The enumeration presupposes something not enumerated").
It is difficult to imagine a clearer example of such a "great substantive and independent power" than the power to "help protect the public ... and alleviate public safety concerns," ante, at 2503. I find it implausible to suppose-and impossible to support-that the Framers intended to confer such authority by implication rather than expression. A power of *403 that magnitude vested in the Federal Government is not "consist[ent] with the letter and spirit of the constitution," McCulloch, supra, at 421, and thus not a " proper [means] for carrying into Execution" the enumerated powers of the Federal Government, U.S. Const., Art. I, § 8, cl. 18. See United States v. Comstock, 560 U.S. 126, 153, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (KENNEDY, J., concurring in judgment) ("It is of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause").
It makes no difference that the Federal Government would be policing people previously convicted of a federal crime-even a federal sex crime. The fact of a prior federal conviction, by itself, does not give Congress a freestanding, independent, and perpetual interest in protecting the public from the convict's purely intrastate conduct.
*2508 But as I have said, I do not understand the majority's opinion to be based on such a power. The connection to the Military Regulation Clause on which the majority relies, ante, at 2503, is less attenuated, and the power it produces less substantial, than would be true of a federal police power over prior federal offenders; the power to threaten and impose particular obligations as a result of a violation of military law is not such a "great substantive and independent power" that the Framers' failure to enumerate it must imply its absence.
Nevertheless, I fear that the majority's discussion of the public-safety benefits of the registration requirement will be mistaken for an endorsement of the Solicitor General's public-safety basis for the law. I accordingly concur in the judgment only.
Justice ALITO, concurring in the judgment.
I concur in the judgment solely on the ground that the registration requirement at issue is necessary and proper to execute Congress' power "[t]o make Rules for the Government *404 and Regulation of the land and naval Forces." U.S. Const., Art. I, § 8, cl. 14. Exercising this power, Congress has enacted provisions of the Uniform Code of Military Justice (UCMJ) that authorize members of the military to be tried before a military tribunal, rather than a state court, for ordinary criminal offenses, including sex crimes, that are committed both within and outside the boundaries of a military installation. See, e.g., UCMJ Art. 2 (persons subject to UCMJ); Art. 5 ("This chapter applies in all places"); Art. 120 (rape by a person subject to UCMJ); Solorio v. United States, 483 U.S. 435, 436-438, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987) (servicemember may be court-martialed for off-base crime without "service connection"). States usually have concurrent jurisdiction over such crimes when they are committed off base and sometimes possess jurisdiction over such offenses when committed on base.[1] These offenses, however, are rarely prosecuted in both a military and a state court, and therefore when a servicemember is court-martialed for a sex offense over which the State had jurisdiction, this is usually because the State has deferred to the military.[2] Where the offense *405 in *2509 question is a sex crime, a consequence of this handling of the case is that the offender, if convicted, may fall through the cracks of a state registration system. For example, if the servicemember is convicted of a sex offense in a state court, the state court may be required by state law to provide that information to the state registry. See, e.g., Colo.Rev.Stat. Ann. § 16-22-104(1)(a)(I) (2012). State law may also require the state corrections department to notify both state and local police of the offender's release. See, e.g., § 16-22-107(3). Provisions such as these are designed to prevent sex offenders from avoiding registration, as many have in the past. See H.R.Rep. No. 109-218, pt. 1, p. 26 (2005) (despite pre-SORNA registration efforts, "[t]he most significant enforcement issue in the sex offender program [was] that over 100,000 sex offenders, or nearly one-fifth in the Nation are 'missing,' meaning that they have not complied with sex offender registration requirements"). When a servicemember is convicted by a military tribunal, however, the State has no authority to require that tribunal to notify the state registry, nor does it have the authority to require the officials at a military prison to notify state or local police when the servicemember is released from custody. Because the exercise of military jurisdiction may have this effect-in other words, may create a gap in the laws intended to maximize the registration of sex offenders-it is necessary and proper for Congress to require the registration *406 of members of the military who are convicted of a qualifying sex offense in a military court. When Congress, in validly exercising a power expressly conferred by the Constitution, creates or exacerbates a dangerous situation (here, the possibility that a convicted sex offender may escape registration), Congress has the power to try to eliminate or at least diminish that danger. See United States v. Comstock, 560 U.S. 126, 155-158, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (ALITO, J., concurring in judgment). I accordingly concur in the judgment only.

See 1 F. Gilligan & F. Lederer, Court-Martial Procedure § 2-40.00, p. 2-47 (3d ed. 2006) (hereinafter Gilligan & Lederer). This depends on the circumstances under which the Federal Government acquires the land in question. See Morrison, State Property Tax Implications for Military Privatized Family Housing Program, 56 Air Force L.Rev. 261, 269-270 (2005). See generally Manual for Courts-Martial, United States, Rule for Court-Martial 201(d) (3) (2012) (Rule) (discussing situations "[w]here an act or omission is subject to trial by court-martial and by one or more civil tribunals"); D. Schlueter, Military Criminal Justice: Practice & Procedure § 4-12(A), p. 231 (8th ed. 2012) (hereinafter Schlueter).

"Where an act or omission is subject to trial by court-martial and by one or more civil tribunals," "the determination which nation, state, or agency will exercise jurisdiction is a matter for the nations, states, and agencies concerned, and is not a right of the suspect or accused." Rule 201(d)(3). And as the commentary to Rule 201(d) explains, "the determination which agency shall exercise jurisdiction should normally be made through consultation or prior agreement between appropriate military officials ... and appropriate civilian authorities." See Discussion following Rule 201(d), p. 2-10; see also Secretary of Air Force, Air Force Instruction 51-201, §§ 2.6.1-2.6.3 (June 6, 2013); Schlueter § 4-12(B), at 231-232. "[I]t is constitutionally permissible to try a person by court-martial and by a State court for the same act," Discussion following Rule 201(d), at 2-10; see Schlueter § 4-12(B), at 232, § 13-3(F), at 691; however, "as a matter of policy a person who is pending trial or has been tried by a State court should not ordinarily be tried by court-martial for the same act," Discussion following Rule 201(d), at 2-10; Air Force Instruction 51-201, §§ 2.6.1, 2.6.2; Gilligan & Lederer § 7-50.00, at 7-17.