IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-357

Filed 18 March 2026

Buncombe County, Nos. 23CR338100-100, 23CR000260-100

STATE OF NORTH CAROLINA

v.

RICHARD NATHAN SMATHERS

Appeal by defendant from judgment entered 4 April 2024 by Judge Karen Eady-Williams in Buncombe County Superior Court. Heard in the Court of Appeals 17 February 2026.

> *Attorney General Jeff Jackson, by Solicitor General Nicholas S. Brod and Solicitor General Fellow Meighan R. Parsh, for the State*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Wyatt Orsbon, for defendant*

ARROWOOD, Judge.

Richard N. Smathers ("defendant") appeals from judgment after jury trial where he was convicted of failure to report an online identifier with the registering sheriff and being a habitual felon. Defendant asks us to reverse his conviction because the statutory reporting requirement is facially unconstitutional. For the following reasons, we disagree and find no error.

## I.     Background

As in all 50 states, convicted sex offenders are subject to statutory registration

and reporting requirements in North Carolina. In 2010, a jury in Buncombe County Superior Court convicted defendant of taking indecent liberties with a child. Therefore, he was subject to these requirements.

On 21 December 2022, as he began post-release supervision after an unrelated imprisonment, defendant visited the Buncombe County Sheriff's Department to register as required. The office gave him a "Duty to Register" packet listing the registration and reporting requirements. Paragraph 14 reads as follows:

> ONLINE IDENTIFIERS 14-208.7(b)(7), 14-208.9, and 14-208.9A(a)(3):
>
> I am required to provide and verify my use of any Online Identifiers with the registering sheriff's office.
>
> "Online Identifier" means electronic mail address, instant message screen name, user ID, chat or other Internet communication name, but it does not mean social security number, date of birth, or pin number [NCGS 14-208.6(1n)].
>
> I understand that if I change an online identifier, or obtain a new online identifier, then I must report IN-PERSON within 10 days to the registering sheriff to provide the new or changed online identifier information.

Defendant marked each paragraph, including the above language, with his initials. He also signed two forms acknowledging receipt of the packet, that he had an opportunity to ask questions about it, and that he understood its contents. On this date, defendant reported only two online identifiers: a Gmail address and "Grinder [sic] Richard Smathers."

Melissa Whiteside ("Ms. Whiteside"), an administrator with the Sheriff's

Department, certified that he completed the paperwork and entered his online identifiers in the state database, making them accessible to law enforcement. She testified that she knew defendant because he registered as required for years and had already seen and filled out this packet numerous times. Both Ms. Whiteside and Detective Tonya Reeves ("Detective Reeves") of the Sheriff's Department confirmed in testimony that they had discussed the requirements with defendant.

On 16 June 2023, defendant had a scheduled meeting with Officer Amy Cleary ("Officer Cleary"), a probation and parole officer with the Department of Adult Corrections. The conditions of defendant's post-release supervision included warrantless searches of his electronic devices. While searching defendant's phone, Officer Cleary saw two social media applications with reportable online identifiers: Grindr and Snapchat. In the Snapchat app, she saw an account with the username "Nathan_Smathers" created on 8 January 2023. She photographed the account information on defendant's phone. When she asked if he had reported this account, defendant said he intended to do so that day. Defendant admitted that he was using Snapchat to send pictures of his penis. Officer Cleary contacted Detective Reeves, who confirmed that defendant had not reported the account username.

Defendant was arrested and charged for failing to report his online identifiers and with being a habitual felon. When the case came to trial, defendant moved to dismiss the substantive charge on First Amendment grounds, and after a pretrial motions hearing on 2 April 2024, the court denied this motion. Defense counsel

renewed the motion to dismiss on the same grounds at the close of the State's evidence and at the close of all evidence, and the court again denied the motions. The jury convicted defendant of the substantive charge and the status offense, and defendant appealed.

## II.    Discussion

On appeal, defendant argues that the reporting requirements, N.C.G.S. §§ 14-208.7(b)(7), 14-208.9(e), are facially unconstitutional under the First Amendment.

### A.    Standard of Review

We review constitutional challenges to statutes *de novo*. *N.C. Ass'n of Educators, Inc. v. State*, 368 N.C. 777, 786 (2016). Accordingly, we consider the constitutional question anew and freely substitute our conclusion for that of the trial court. *State v. Williams*, 362 N.C. 628, 632–33 (2008). "This Court presumes that statutes passed by the General Assembly are constitutional, and duly passed acts will not be struck unless found unconstitutional beyond a reasonable doubt[.]" *N.C. Ass'n of Educators, Inc.*, 368 N.C. at 786 (citations omitted).

### B.    Facial Challenges to Statutes on First Amendment Grounds

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "Encroachment of First Amendment protections" are "permitted for appropriate reasons." *Elrod v. Burns*, 427 U.S. 347, 360 (1976). However, "[s]ignificant impairment of First Amendment rights must survive exacting scrutiny." *Id.* at 362. Generally, litigants

mounting a constitutional facial challenge to a statute "must establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Defendant does not claim that the statute is unconstitutional as applied to the facts of his own case. However, he need not do so to establish standing in the instant case, although he invokes only the rights of third-party convicted sex offenders whose conduct the statute governs. Litigants to whom a statute is lawfully applied have standing to argue the statute violates the First Amendment on its face because it is overbroad. *United States v. Hansen*, 599 U.S. 762, 769–70 (2023).

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). An unconstitutionally overbroad statutory scheme "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep" such that "society's interest in free expression outweighs its interest in the statute's lawful applications." *Hansen*, 599 U.S. at 769–70 (cleaned up) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). However, it must be noted that "[w]e seldom uphold facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them." *Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*, 363 N.C. 500, 502 (2009).

C.     Level of Scrutiny

As threshold matters, we must determine whether the challenged statutory scheme implicates First Amendment activity, and which level of scrutiny to apply, which depends upon whether the statutes are content-neutral. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).

1.  The Reporting Requirements Implicate First Amendment Activity

First Amendment protections apply in full to the internet, which is today the major forum for the exchange of ideas and the exercise of our First Amendment rights. *See Packingham v. North Carolina*, 582 U.S. 98, 104–107 (2017); *see also Reno v. ACLU*, 521 U.S. 844, 868 (1997). Laws that do not directly prohibit speech may nevertheless burden its exercise, as the "distinction between laws burdening and laws banning speech is but a matter of degree." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000). Therefore, "scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct." *Elrod*, 427 U.S. at 362 (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976)). With these fundamental principles in mind, we look at the statutes to determine whether they burden any First Amendment activity, whether directly or indirectly.

Anyone convicted of a reportable conviction must register with the sheriff in their county of residence. N.C.G.S. § 14-208.7(a). Generally, reportable convictions encompass all sexually violent offenses towards victims, certain offenses against minors (such as kidnapping), substantially similar offenses committed in other

- 6 -

jurisdictions, as well as attempts, solicitations, and conspiracies to commit such crimes. *Id.* § 14-208.6(a)(4). In addition to addresses and other identifying information such as height and weight, all offenders must report in person "[a]ny online identifier that the person uses or intends to use." *Id.* § 14-208.7(b)(7). The term "online identifier" is defined as follows: "Email address, instant message screen name, user ID, chat or other internet communication name, but it does not mean social security number, date of birth, or pin number." *Id.* § 14-208.6(1n). Whenever the offender obtains or changes an online identifier, he must report it to the sheriff within ten days. *Id.* § 14-208.9(e). Failure to timely report online identifiers is a Class F felony. *Id.* § 14-208.11(10).

Much of the reported information is freely available as public record through the statewide sex offender registry, including the offender's address and photo, but not the online identifiers. *Id.* §§ 14-208.10(a), 14-208.15(a). An offender's online identifiers are released publicly in only three ways. First, the sheriff or Department of Public Safety ("DPS") "shall release any other relevant information that is necessary to protect the public concerning a specific person." *Id.* §§ 14-208.10(a), 14-208.15(a). Second, "any person may obtain a copy of an individual's registration form, a part of the county registry, or all of the county registry, by submitting a written request for the information to the sheriff" or DPS. *Id.* §§ 14-208.10(b), 14-208.15(b). After developing standards regarding their release and use, the DPS "may release registry information regarding a registered offender's online identifier to an entity

for the purpose of allowing the entity to prescreen users or to compare the online identifier information with information held by the entity" who applies, pays a fee, and complies with the DPS criteria. *Id*. § 14-208.15. The entity must cross-check that information and make a report whenever it receives complaints that a user is soliciting sex with a minor or transmitting child pornography. *Id*.

What this means in practice is that once a sex offender is convicted, a vast amount of their internet use, and therefore their potential First Amendment activity, is subject not only to frequent reporting but to law enforcement monitoring. Some reportable online identifiers are for services that could put juveniles at risk, such as social networking sites or dating apps. Some are for web services less likely to lead to sex crimes, such as user IDs for blogging, watching YouTube, or commenting on news articles. All these services share the ability to host lawful speech and expression protected by the First Amendment.

Conditioning lawful speech activity on an "affirmative obligation" to report it to the government "is almost certain to have a deterrent effect" and is an indirect burden in conflict with the First Amendment's purpose. *Lamont v. Postmaster General*, 381 U.S. 301, 307 (1965). It necessarily follows that these statutes place an indirect burden with a likely deterrent effect upon offenders' exercise of certain First Amendment rights. The First Amendment also protects anonymous speech. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). The statutes abridge this protection, because the statutes provide a means for the public to acquire

offenders' online identifiers. Therefore, the reporting requirements raise genuine First Amendment issues.

2.  The Reporting Requirements are Content-Neutral and Must Satisfy Intermediate Scrutiny

Next, we ask "whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). Laws which "impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner*, 512 U.S. at 643. A content-based regulation is presumptively unconstitutional and can only survive strict scrutiny if it "promote[s] a compelling interest" and "chooses the least restrictive means to further the articulated interest." *Sable Commc'ns of Cal., Inc. v. FCC,* 492 U.S. 115, 126 (1989). Alternately, a content-neutral regulation receives intermediate scrutiny, which is "less demanding but still rigorous." *State v. Bishop*, 368 N.C. 869, 874 (2016). The State must prove that the statute is "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 796.

The reporting requirement makes no reference to the content of the online identifiers, merely their type or format, such as e-mail addresses. N.C.G.S. § 14-208.6(1n). They do not prohibit the communication of any specified ideas or subject matter. Therefore, intermediate scrutiny is the appropriate standard upon which to judge their constitutionality.

D.     Analysis

Statutes regulating conduct while incidentally burdening speech are "valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). We discuss the government's interest and then the parties' arguments that the statutes are overbroad or narrowly tailored.

1.     The Reporting Requirements Further Important Government Interests

"It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological wellbeing of a minor is compelling." *New York v. Ferber*, 458 U.S. 747, 756–57 (1982) (internal quotation marks omitted). Recidivism presents tremendous challenges unique to sex crimes. "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *McKune v. Lile*, 536 U.S. 24, 33 (2002) (plurality opinion); *accord United States v. Kebodeaux*, 570 U.S. 387, 395 (2013).

When the Legislature enacted these statutes in 1995, home internet access was a relatively new phenomenon. The internet posed novel threats to child safety but provided new opportunities for preventing sex crimes by known offenders. Identifying as its concern that community protection was "impaired by the lack of

- 10 -

information available to law enforcement agencies about convicted offenders who live within the agency's jurisdiction," the Legislature sought to "require the exchange of relevant information about those offenders among law enforcement agencies, and to authorize the access to necessary and relevant information about those offenders[.]" N.C.G.S. § 14-208.5. It is therefore beyond dispute that the statute addresses a government interest of the greatest importance.

The government "must do more than simply posit the existence of the disease sought to be cured" but must demonstrate that this "regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664. Although offenders must report identifiers for platforms that pose limited risks to children, they must also report identifiers for websites frequently used for nefarious reasons, such as Snapchat, hence why defendant cannot dispute that the statutes were constitutionally applied against him. This conduct is precisely what legislatures and law enforcement have a duty to monitor, and mandatory disclosure empowers them to do so. Here, the State has sufficiently demonstrated that the statutes further the stated goal of alleviating an information shortage that hinders crime prevention.

Statutory strategies which "prevent a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor . . . must be the State's first resort to ward off the serious harm that sexual crimes inflict." *Packingham*, 582 U.S. at 107. Accordingly,

we have no doubt this statute furthers important purposes unrelated to the suppression of protected speech.

2.    <u>Defendant Argues the Statutes are Overbroad and Not Narrowly Tailored</u>

In arguing overbreadth, defendant must establish that the scheme "prohibits a substantial amount of speech relative to its plainly legitimate sweep." *Hansen*, 599 U.S. at 770. These unconstitutional applications must be "realistic, not fanciful" and their relative disproportionateness must be substantial. *Id.* (citations omitted). To determine whether "society's interest in free expression outweighs its interest in the statute's lawful applications," we are guided by the principle that overbroad laws "may deter or 'chill' constitutionally protected speech," and if would-be speakers remain silent, society will lose their contributions to the "marketplace of ideas." *Id.* (quoting *Williams*, 553 U.S. at 292 and *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003)).

Defendant offers three reasons why the statutory scheme is overbroad. First, he argues that the statutes are "categorical" and "indiscriminately sweep up too much online activity," obliging offenders to report all their online identifiers, including those "associated with internet platforms that can't reasonably be used to commit sex crimes" and "apply to broad swaths of lawful speech." Second, they provide no exception for offenders who "have never engaged in the sort of online activity that the government seeks to deter" and thereby "impermissibly fail to account for individualized risk." Third, he argues that there is no "meaningful limitation on law

enforcement agencies' use of an offender's online identifiers" or any "constraining principle" on their public release when deemed necessary for their protection, or upon written request. None of these reasons is sufficient to show that the statute is overbroad on its face.

First, to pursue its stated aim of information gathering, the Legislature is not required to make exceptions for offenders who did not use the internet to facilitate their conviction offense. It would be naïve and dangerous to legislate in this area with rose-colored glasses, assuming that an offender who met his first young victim in a public park would therefore be unlikely to pursue his next victim online. The State's use of the Static-99 forensic procedure to assess individualized risk is indeed valuable, but only for making classifications between offenders. Defendant does not show that the Static-99 alone is sufficient to further the Legislature's stated goal. Therefore, the reporting requirements are not overbroad in the number or categories of offenders covered. Nor, for reasons we discuss below, are they overbroad in the number or categories of online identifiers they require offenders to report.

However, defendant's argument does allow us to illustrate a realistic scenario raising legitimate constitutional concerns. Imagine the following. A convicted sex offender, fully compliant with the reporting requirements, publishes an article on his popular local politics blog challenging untrue statements from an official's recent press conference. The offender rightly believes that blogging under his legal name would overshadow the substance of his political posts, because his name and offense

are public record and stigma is a "collateral consequence" of sex offender registries. *Smith v. Doe*, 538 U.S. 84, 99 (2003). And like many political writers before him, including Thomas Paine and the authors of the Federalist Papers, he believes that publishing under his pseudonym makes him a more effective critic. *See Talley v. California*, 362 U.S. 60, 64–65 (1960). The offender is no Alexander Hamilton, but he nevertheless exercises his right to a forum where "a writer who may be personally unpopular [can] ensure that readers will not prejudge [his] message simply because they do not like its proponent." *McIntyre*, 514 U.S. at 342. Although a member of the public who requests sex offenders' online identifiers could plausibly unmask him, only the offender and a handful of local officers know the blogger's identity.

The sheriff happens to live in the offender's neighborhood. Like many parents, he carefully oversees his children's internet use. As sheriff, he also has access to the online identifiers of local sex offenders, and he keeps tabs on the offenders who live nearby. But after the blog criticizing the press conference, word gets around within the sheriff's department that the anonymous blogger and the sex offender are one and the same. Although the blog is protected speech, the sheriff decides to release all the offender's online identifiers, arguing that they fall under his statutory mandate to "release any other relevant information that is necessary to protect the public concerning a specific person." N.C.G.S. § 14-208.10(a). A city paper writes up the report, and the offender loses his *de facto* anonymity, so he shuts down the blog and stops commenting on local politics.

It would be challenging to argue on these hypothetical facts that it was necessary to unmask the pseudonym for the public's protection, so the sheriff's decision in this hypothetical could constitute a First Amendment violation. Accordingly, the broadness of the statutory scheme makes possible both legitimate and unconstitutional applications, and defendant's argument that release of online identifiers "may deter or 'chill' constitutionally protected speech" is both plausible and well-grounded.

But "[t]he fact that a statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *State v. Bryant*, 359 N.C. 554, 564 (2005) (quoting *State v. Thompson*, 349 N.C. 483, 491 (1998)). Defendant has not shown that the public's interest in preventing plausible unconstitutional applications, like the one illustrated above, is substantially disproportionate relative to its overriding interest in ensuring law enforcement can perform the statutes' constitutional applications. The offender's interest in anonymous online speech and the public's interest in hearing it are both important but they cannot overcome the public's interest in online safety and effective policing.

To explain why, we turn now to the State's argument that the statute is not overbroad and is sufficiently narrowly tailored to survive intermediate scrutiny.

3.  The State Argues the Statutes are Narrowly Tailored to Further an Important Government Interest Unrelated to Speech

The State argues, and we agree, that the amount of speech deterred or chilled

is neither substantial nor disproportionate relative to the scheme's "plainly legitimate sweep," although it could be "adequately served" if the legislature approved "some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800. In this context, narrow tailoring does "not turn on whether [courts] agree with the Government's conclusion that its chosen regulatory path is best or most appropriate." *TikTok, Inc. v. Garland*, 604 U.S. 56, 78 (2025) (per curiam) (internal quotation marks omitted). We "accord substantial deference to the [legislature's] predictive judgments" here, because "sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *TikTok*, 604 U.S. at 69–70 (citing *Turner*, 512 U.S. at 665). This is especially crucial in the present inquiry, as we are mindful that the internet is a global project in constant evolution, where novel platforms continue to lead revolutionary advances overnight, providing new tools for legislatures, law enforcement, and sex offenders alike. *See Packingham*, 582 U.S. at 105.

i.     <u>Reporting Requirements Deter Some Speech Without Prohibiting It</u>

First, the State argues that the reporting requirements do not categorically prohibit sex offenders from speaking on the internet. This distinguishes this statute from the law the United States Supreme Court struck down in *Packingham*, through which North Carolina had made it a felony for sex offenders to use any "commercial social networking Web site" where he knows minor children are permitted to create

accounts. There, the Supreme Court held that "the State may not enact this complete bar to [offenders'] exercise of First Amendment rights on websites integral to the fabric of our modern society and culture." *Packingham*, 582 U.S. at 109. In the instant case, however, offenders retain the right to use the internet to engage in public discourse, so long as they have reported the identifier used, or timely report a new one within ten days.

Furthermore, disclosure requirements, when previously challenged on First Amendment grounds, have been found "a less restrictive alternative to more comprehensive regulations of speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 369 (2010); *see also Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985) (finding that, although "unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech," disclosure requirements "trench much more narrowly" on the speaker's interests than do "flat prohibitions on speech."). Here, the State already requires offenders to verify their addresses, names, and online identifiers in person every six months, and the legislature grants sheriffs the authority to require these in-person verifications even more regularly. N.C.G.S. § 14-208.9A. Offenders must weigh some of their online speech against the requirement to disclose new or changed online identifiers within ten days, but where offenders already report in person on a regular basis to disclose or verify other information, the inconvenience imposed is not unduly onerous, nor is it unjustified. Less frequent reporting would

foreseeably create loopholes benefiting online offenders and erecting obstacles to more diligent online monitoring.

Importantly, the internet is not the only place a person can express views anonymously. The offender may be deterred from making some anonymous online speech, but the First Amendment protects a huge bundle of speech rights. He can create a Substack account for his anonymous blog, but if he is deterred from doing so due to the possibility that a citizen who requests online identifiers will someday cross-check his username against his disclosed registration packet, this does not mean the public can never hear his speech. Newspapers often publish anonymous op-eds, lawful protesters often wear masks nowadays, and the Supreme Court has extensive jurisprudential history protecting the right to distribute anonymous handbills and campaign materials or retain anonymity while canvassing door-to-door. *See generally Talley v. California*, 361 U.S. 60 (1960); *McIntyre*, 514 U.S. 334; *Watchtower Bible and Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002). Even assuming *arguendo* the implausible hypothetical that, because of these reporting requirements, *all* offenders are *always* deterred from making *any* online anonymous speech, they nonetheless retain every anonymous "alternative channel of communication" that continues alongside the internet.

### ii.     Statutory Construction

Second, the State counsels us to apply a narrowing construction of the definition for "online identifier." The statute reads: "Email address, instant message

screen name, user ID, chat or other internet communication name, but it does not mean social security number, date of birth, or pin number." *Id.* § 14-208.6(1n). The State claims that the statute "targets online identifiers associated with accounts like email or instant messaging that allow for private, person-to-person communication" i.e. usernames for platforms by which offenders are most likely to recidivate. Although the State admits that the term "user ID" does not necessarily encompass only such online accounts, it counsels that we should apply the *noscitur a sociis* canon, construing "user ID" in the context of "email address," "instant message screen name," and "chat or other internet communication name" such that the requirement "focus[es] on identifiers that enable private, person-to-person communications." We should apply this narrow construction, the State argues, because "user ID" is "a general phrase [that] can be given a more focused meaning by the terms linked to it." *Fischer v. United States*, 603 U.S. 480, 488 (2024).

But in statutory interpretation, we always begin by reading the plain language before we apply such canons of construction. We always "presume that the means employed by the Legislature to express its will are adequate to the purpose and do express that will correctly." *State v. Barco*, 150 N.C. 792, 796 (1909) (cleaned up). Therefore, we may not "interpret what has no need of interpretation and, when the words have a definite and precise meaning, [we cannot] go elsewhere in search of conjecture in order to restrict or extend the meaning." *Id.* (cleaned up). "The primary objective of statutory interpretation is to give effect to the intent of the legislature."

*First Bank v. S & R Grandview, L.L.C.,* 232 N.C. App. 544, 546 (2014) (internal citations omitted). "[W]e first examine the plain words of the statute because the text of the statute is the best indicia of legislative intent." *Sturdivant v. N.C. Dep't of Pub. Safety*, 386 N.C. 939, 944 (2024) (cleaned up). "If the plain language of the statute is unambiguous, we apply the statute as written." *Id.* (cleaned up).

Any time the legislature explicitly sets out definitions for its terms, we must respect them as "virtually conclusive." *Happel v. Guilford Cnty. Bd. of Educ.*, 387 N.C. 186, 208 (2025) (quotes omitted); *accord Sturdivant*, 386 N.C. at 947 ("[I]t would be quite abnormal for the General Assembly to define a term and then decline to use that definition . . . . Doing so undermines the very reason that the General Assembly would add a statutory definition in the first place."). Undefined words of a statute will be given their natural, approved, and recognized meaning. *Black v. Littlejohn*, 312 N.C. 626, 638 (1985) (citing *In Re Appeal of Martin,* 286 N.C. 66 (1974)); *accord In re Clayton-Marcus Co.,* 286 N.C. 215, 219 (1974) (Undefined words "must be given their common and ordinary meaning."). To determine the intended meaning of the language, courts may resort to dictionaries to determine definitions of undefined words within statutes. *Id.* at 638.

Here, we seek the plain meaning of the undefined word "user ID" within a definition statute. Cambridge Business English Dictionary defines "username . . . (also user ID)" as "a name or other information that you enter, usually with a password . . . in order to use a computer system, website, etc." *Username*,

CAMBRIDGE BUSINESS ENGLISH DICTIONARY (1st ed. 2011). This definition is indeed broad, but we agree that it is the common, ordinary, plain, and unambiguous meaning of the term "user ID."

Additional principles of statutory interpretation underline this broad interpretation. We always seek to interpret the meaning intended upon the statute's enactment. *State v. Rankin*, 371 N.C. 885, 889 (2018). And because this is a statute imposing affirmative obligations and criminal penalties, we must construe the statute "with regard to the evil which it is intended to suppress." *In re Banks*, 295 N.C. 236, 238 (1978); *accord O&M Indus. v. Smith Eng'g Co.*, 360 N.C. 263, 268 (2006) (We "consider the policy objectives prompting passage of the statute and should avoid a construction which defeats or impairs [its] purpose. . . . A remedial statute must be construed broadly in the light of the evils sought to be eliminated, the remedies intended to be applied, and the objective to be attained." (cleaned up)).

The Legislature enacted this statute to remedy "lack of information available to law enforcement agencies about convicted offenders" by requiring those offenders to register, requiring agencies to exchange registration information, and by authorizing access for "others" to whatever information is "necessary and relevant." N.C.G.S. § 14-208.5. The Legislature of 1995 was no more able to reliably predict the coming of social media and the iPhone than the Founders were able to predict penicillin and commercial space travel. Their stated purpose and the statutory language used are both broad and therefore prudent. Requiring offenders to only

report their usernames on more specific categories of websites or platforms would have required knowing exactly what type of platforms would arise in the distant future, or which types of platforms would evolve and become more useful to offenders. We also lack a crystal ball. Accordingly, we will not adjust the meaning of an unambiguous term to correspond with present understandings. That is the Legislature's prerogative, not ours.

Defendant is correct that the statute reaches beyond the principal evil legislators intended or expected to address, but "the fact that a statute is applied in situations not expressly anticipated does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 674 (2020) (internal quotes removed) (cleaned up). Presuming that the Legislature carefully chose "user ID" for its prognosticative generality, we will not narrow our construction and limit enforcement to usernames on platforms meant for user-to-user messaging.

Reading the rest of the definition for "online identifiers" only confirms this holding. The State asks us to apply *noscitur a sociis* using the words "or other internet communication name" but overlooks the words that follow: "but it does not mean social security number, date of birth, or pin number." N.C.G.S. § 14-208.6(1n). We must "give every word of the statute effect, presuming that the legislature carefully chose each word used." *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009). Had the Legislature not intended the preceding words of the definition

to be read broadly, it would not have deemed it necessary to expressly include three highly specific exceptions.

Finally, we note that offenders must report only one's *current* online identifiers. This means that any names used to speak online in the past are not covered, and that speech is unaffected. On the other hand, it is somewhat ironic that offenders must report any alias they have been known by in the real world, presumably including aliases under which they exercised their speech rights. And though these aliases are widely available on the online registry, only online identifiers are challenged in the instant case.

### iii. Public Release of Online Identifiers is Properly Circumscribed

The State's third argument discusses the public disclosure provisions, which it argues confirm the reporting requirement's narrow tailoring. The State points out that the online identifiers are only disclosed to members of the public in a separate time and place from offenders' anonymous online speech, either on an individual's written request or to protect the public from a specific offender, and argues that these public disclosures are "precisely targeted to the State's public safety interests" and "empower the public, if it wishes, to make the informed decision" to avoid interacting with offenders online. Further, disclosure to the private companies who apply for access to the online identifiers is integral to their statutory obligation to report user complaints about child pornography and soliciting minors.

First, use of online identifiers by law enforcement and their release to private

companies, such as social media apps, is essential to the ongoing communication and information-gathering that protects minors online. The Legislature also established clear standards forbidding disclosure to entities for "any purpose other than for prescreening its users or comparing the database of registered users . . . against the list of online identifiers[.]" N.C.G.S. § 14-208.15A(d). In setting a restricted disclosure framework while simultaneously serving the public's interest in online safety, the statutes releasing online identifiers to law enforcement and private entities easily pass intermediate scrutiny.

The public disclosure provisions pose a closer question, but we are satisfied that their narrow tailoring allows for sufficiently limited unconstitutional application. The public has free access to offenders' other registration information, including their home addresses, conviction offenses, and a recent photograph. Online identifiers are never published on the state's sex offender registry website. If a member of the public wants an offender's online identifiers, they must request in writing the registration information of either a specific individual offender or the entire state registry, which contains approximately 25,000 offenders. And to ensure one's database of online identifiers is entirely up to date, one must make a new written request at least once every ten days. The sheriff may charge the costs of duplication and shipping.

Clearly, the time, effort, and cost required for a member of the public to maintain a full and current database of offenders' online identifiers is not negligible.

Further, the amount of online identifiers involved is overwhelming. If this civilian database actually deterred an offender from making protected anonymous online speech, the offender would have to presume that its keeper constantly and repeatedly searches tens of thousands of identifiers to indiscriminately monitor or expose offenders. Accordingly, such an unlikely scenario has little effect on our analysis. The relevant provision need not be more narrowly tailored in light of this hypothetical deterrence.

In the case of public requests for *individual* offenders' registration materials, other considerations come into play. One can easily understand why individual requests are in the public interest. An offender's previous victim may want her abuser's online identifiers to know if he contacts her under another name. A parent may search the online registry for offenders in her neighborhood and wish to know their online identifiers out of an abundance of caution. Those who run youth programs, camps, or local sports leagues may want to maintain situational awareness in case a local offender tries to enter their communities' associated Facebook groups. And if someone believes an offender is already stalking or grooming their child online, confirming his online identifiers will help protect the child and preserve evidence. People have every right to make informed choices about their online activity. Wherever it is proper and constitutional for law enforcement and the public to exchange information to prevent sex offenses, the State has an affirmative duty to make it possible. Accordingly, these public interests are essential to our analysis.

- 25 -

We are satisfied that public release of individual offenders' materials on written request is narrowly tailored. Importantly, the statute provides that the public may write to request a specific offender's online identifiers, but not *vice versa*: one cannot inquire whether a specific online identifier is associated with an offender. Therefore, the statute only unmasks an offender's protected anonymous online speech to members of the public who request either the whole database or the specific individual's file. It never allows someone who takes issue with the online speech to find out whether the person behind the username has a criminal history. When someone requests an individual offender's file, it is very likely because she already has reason to believe the offender poses risks to her own safety or the safety of those towards whom she owes a duty of care. In relation to the offender's speech rights, the public release provisions allow for transparency "to inform the public for its own safety," not as a "scheme forcing an offender to appear in public with some visible badge of past criminality" when he speaks anonymously. *Smith*, 538 U.S. at 99 (2003). Accordingly, this provision is sufficiently narrowly tailored.

Otherwise, an online identifier is only released when the sheriff or DPS deems disclosure necessary to protect the public from an individual offender. It was sensible for the Legislature to grant law enforcement discretion on the question, rather than impose a limiting principle. Because these statutes cover such a wide variety of reportable convictions and offenders, it is reasonable that certain provisions in the reporting requirements accord discretion and deference to law enforcement as they

respond in individual circumstances. The public release provision is no exception. As we discussed above, such disclosure may not be strictly necessary to public safety in every individual instance and would thereby incur constitutional scrutiny. But we are unconvinced that this provision must be narrowed by a limiting principle where public release of online identifiers is already so circumscribed.

4.      The Statutory Scheme is Narrowly Tailored

In furthering law enforcement's information gathering for sex crime prevention, the requirements as to online identifiers cover neither too much activity nor too many offenders, and the associated public disclosure provisions impose sufficient limits on release. The statutes impose no speech restrictions, preferring instead to deter recidivist online conduct by mandating regular disclosures. This may incidentally burden some speech activity, but this possible encroachment is insufficient to override other relevant public interests, and it does not establish that the Legislature failed to narrowly tailor its requirements. It is not our role to determine whether this was the best regulatory method to confront this challenge, and the First Amendment does not require the Legislature to choose the least restrictive method available. In these analyses, where the Legislature has balanced competing interests and struck a workable compromise, we show their solutions ample deference.

Therefore, we are satisfied that the reporting requirements are facially constitutional. Defendant did not bring an as-applied challenge here, and any such

case would pose a different set of questions which we do not answer here.

### III.    Conclusion

For the above reasons, we find no error and affirm defendant's conviction.

NO ERROR.

Judge WOOD concurs.

Judge GRIFFIN concurs in the result.